# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

BURNS & WILCOX, LTD., a
Michigan corporation,

  PLAINTIFF,

V

JAMES E. EPTING, JR., individually,
GRIFFIN R. JENNINGS, individually,
BRENT JOHNSON, individually,
CARRIE A. SHEEN, individually, and
XS BROKERS INSURANCE
AGENCY, INC, a foreign corporation.

  DEFENDANTS.

Case No.:

HON.:

---

LAWRENCE C. ATORTHY (P44751)
KAUFMAN, PAYTON & CHAPA
*Attorneys for Plaintiff*
30833 Northwestern Hwy., Suite 200
Farmington Hills, MI 48334
248.626.5000/fax 248.626.2843
LCAtorthy@kaufmanlaw.com

---

## <u>VERIFIED COMPLAINT</u>

    Plaintiff Burns & Wilcox, Ltd ("B & W") states as follows for its Verified

Complaint against Defendants:

## JURISDICTIONAL ALLEGATIONS

1.  Plaintiff B&W is a Michigan corporation with its headquarters and principal place of business in Farmington Hills, Oakland County, Michigan.

2.  Upon information and belief, Defendant James E. Epting, Jr., ("Epting") is an individual residing in or near Atlanta, Georgia. Epting is a former employee of Plaintiff B&W.

3.  Upon information and belief, Defendant Griffin R. Jennings ("Jennings ") is an individual residing in or near Atlanta, Georgia. Jennings is a former employee of Plaintiff B&W.

4.  Upon information and belief, Defendant Brent Johnson ("Johnson") is an individual residing in or near Atlanta, Georgia. Johnson is a former employee of Plaintiff B&W.

5.  Upon information and belief, Defendant Carrie A. Sheen ("Sheen") is an individual residing in or near Atlanta, Georgia. Sheen is a former employee of Plaintiff B&W.

6.  Upon information and belief, Defendant XS Brokers Insurance Agency, Inc. ("XS"), is a foreign corporation with principle place of business at 13 Temple ST. Quincy, MA 02169.

7.     The amount in controversy in this matter exceeds an aggregate of $75,000, and Plaintiff also seeks equitable relief.

8.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(1).

9.     Venue is proper pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

10.     Plaintiff operates, among other things, as national wholesalers in the insurance industry, both as broker and managing general agent.

11.     Defendant Epting was employed by B&W as a manager, senior vice president, and managing director in the Atlanta Georgia area. Epting worked for B&W for about 23 years.

12.     As consideration for his employment with Plaintiff, and as consideration for receiving a bonus, Defendant Epting executed a Managers Contact with B & W. (Exhibit A).

13.     Section 3 of the Managers Contact between Epting and B&W states as follows:

> "(c)    During the course of Employee's duties, Employee will have access to confidential and proprietaly information regarding Employer's business. Employee agrees to safeguard and protect such information. Employee further agrees not to, at any time during Employee's employment or thereafter, furnish or disclose to anyone (other than as directed in the normal course of business to further Employer's interest) such confidential information including, but not limited to, client lists, contract terms, ratings, expirations, renewals,

business plans and financial information. Any company records prepared by or in possession of Employee remain the property of Employer, and all copies shall be returned to Employer upon termination of the employment relationship.

"(d) All business developed and handled by Employee, including programs (purchasing group or otherwise), franchise or other regional or national business, during the existence of this employment relationship remain the property of Employer and shall be treated as Employer's proprietary information." (Exhibit A).

14. Section 5 of the Managers Contact between Epting and B&W states as follows:

"Non-Piracy/Competition: During Employee's employment with Employer, and for one year following the last day of the month of termination of this employment relationship, Employee will not directly or indirectly, nor allow any other person or organization to directly or indirectly use any confidential information (including, but not limited to, client lists, contract terms, ratings, expirations, renewals, business plans and/ or financial information) belonging to employer.

"Employee shall not, directly or indirectly, at any time use or disclose to any person or organization any trade secrets or other confidential information relating to the Burns & Wilcox, Ltd. business. Employee shall not take any action that will cause the termination of the business relationship between Burns & Wilcox, Ltd. and any customer or supplier to Burns & Wilcox, Ltd. Employee also shall not solicit for employment any person employed in the Burns & Wilcox, Ltd business." (Exhibit A).

15. This Managers Contact was reasonably necessary to protect the valid business interests of Plaintiff, including, but not limited to, establishment and

maintenance of relationships with existing and future customers, clients, employees and insurers. (Exhibit A).

16.     The geographic and temporal restrictions in the Managers Contact are reasonable under the circumstances. (Exhibit A).

17.     As a result of his position with Plaintiff, and the position's attendant duties and responsibilities, Defendant Epting became intimately familiar with the pricing of Plaintiff's insurance products, as well as with the identities and particularities of Plaintiff's clients and customers and the terms of employment of Plaintiff's employees.

18.     On or about August 30, 2019, Defendant Epting resigned his employment with B&W and started working for Defendant XS.

19.     Defendant XS also acts as a wholesaler in the insurance industry, both as broker and managing general agent in, among other places, the Atlanta, Georgia area.

20.     Upon information and belief. Defendant Epting is acting in essentially the same capacity for Defendant XS as he did for Plaintiff.

21.     Since Defendant Epting has left the employment of Plaintiff, his new employer has hired away at least one of Plaintiff's employees using confidential and/or proprietary information Defendant Epting obtained while employed by

Plaintiff, and Defendant Epting has made a number of attempts to solicit other employees to terminate their employment with Plaintiff.

22.    XS, as well, has solicited business from and/or through some of the clients, agents and customers of Plaintiff.

23.    Defendant Epting actions on behalf of XS in the above-mentioned regard are in violation of his Managers Contact with Plaintiff. (Exhibit A).

24.    Upon information and belief, Defendant Epting will continue to recruit Plaintiff's employees, customers and clients using confidential and proprietary information obtained while he was employed with Plaintiff, and these customers, clients and employees are very unlikely to return to Plaintiff.

25.    The Managers Contact provides that the venue of any action regarding the terms and conditions of the agreement is to be the State of Michigan and that Michigan law shall govern the Agreement. (Exhibit A).

26.    Under an agreement with Plaintiff, Defendant Epting also received advance payment on future bonuses, which he is now required to repay to Plaintiff due to his resignation. The total of the advanced bonuses Defendant Epting owed to Plaintiff is approximately $45,000.

27.    Defendant Jennings was employed by B&W as a commercial lines associate underwriter and a commercial lines underwriter in the Atlanta, Georgia, area. He worked for B&W for about 5 years.

28.    As consideration for his employment with Plaintiff, and as consideration for receiving a bonus, Defendant Jennings signed an Individual Production Award ("Jennings IPA") agreement with Plaintiff that that contained a Non-Solicitation Agreement. (Exhibit B).

29.    Section 5 of the Jennings IPA states as follows:

   "a.    Confidentiality/Non-Disclosure Obligation.

      "i.    Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

                                     * * * * *

"d.    Restrictive Covenants. Employee agrees further that in order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

"i.    Non-Solicitation of Company Officers, Employees, or Contractors. Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or provide services to, or for Employer.

"ii.    Non-Solicitation of Company Clients and Accounts. Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer. For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee had written, quoted or been asked to write or quote contracts and/or policies, facilitated

placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer." (Exhibit B).

30.    The Jennings IPA was reasonably necessary to protect the valid business interests of Plaintiff, including, but not limited to, establishment and maintenance of relationships with existing and future customers, clients, employees and insurers. (Exhibit B).

31.    The geographic and temporal restrictions in the Jennings IPA are reasonable under the circumstances. (Exhibit B).

32.    As a result of his position with Plaintiff, and the position's attendant duties and responsibilities, Defendant Jennings became intimately familiar with the pricing of Plaintiff's insurance products, as well as with the identities and particularities of Plaintiff's clients and customers and the terms of employment of Plaintiff's employees.

33.    On or about September 16, 2019, Defendant Jennings resigned his employment with B&W and started working for Defendant XS.

34.    Defendant XS also acts as a wholesaler in the insurance industry, both as broker and managing general agent in, among other places, the Atlanta, Georgia

area.

35.    Upon information and belief, Defendant Jennings is acting in essentially the same capacity for Defendant XS as he did for Plaintiff.

36.    Since Defendant Jennings has left the employment of Plaintiff, his new employer has hired away at least one of Plaintiff's employees using confidential and/or proprietary information Defendant Jennings obtained while employed by Plaintiff, and Defendant Jennings has made a number of attempts to solicit other employees to terminate their employment with Plaintiff.

37.    XS, as well, has solicited business from and/or through some of the clients, agents and customers of Plaintiff.

38.    Defendant Jennings actions on behalf of XS in the above-mentioned regard are in violation of his agreement with Plaintiff. (Exhibit B).

39.    Upon information and belief, Defendant Jennings will continue to recruit Plaintiff's employees, customers and clients using confidential and proprietary information obtained while he was employed with Plaintiff, and these customers, clients and employees are very unlikely to return to Plaintiff.

40.    The Jennings IPA provides that the venue of any action regarding the terms and conditions of the agreement is to be the State of Michigan and that Michigan law shall govern the Agreement. (Exhibit B).

41.    Defendant Johnson was employed by B&W as an associate managing director in the Atlanta, Georgia, area. He worked for B&W for over 15 years.

42.    As consideration for his employment with Plaintiff, and as consideration for receiving a bonus, Defendant Johnson signed an Individual Production Award ("Johnson IPA") agreement with Plaintiff that contained a Non-Solicitation provision. (Exhibit C).

43.    Section 5 of the Johnson IPA states as follows:

"a.    Confidentiality/Non-Disclosure Obligation

"i.    Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

* * * * *

"d.   **Restrictive Covenants.** Employee agrees further that in order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

"i.   **Non-Solicitation of Company Officers, Employees, or Contractors.** Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or provide services to, or for Employer.

"ii.   **Non-Solicitation of Company Clients and Accounts.** Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer. For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee had written, quoted or been

asked to write or quote contracts and/or policies, facilitated placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer." (Exhibit C).

44.    The Johnson IPA was reasonably necessary to protect the valid business interests of Plaintiff, including, but not limited to, establishment and maintenance of relationships with existing and future customers, clients, employees and insurers. (Exhibit C).

45.    The geographic and temporal restrictions in the Jennings IPA are reasonable under the circumstances. (Exhibit C).

46.    As a result of his position with Plaintiff, and the position's attendant duties and responsibilities, Defendant Jennings became intimately familiar with the pricing of Plaintiff's insurance products, as well as with the identities and particularities of Plaintiff's clients and customers and the terms of employment of Plaintiff's employees.

47.    On or about September 16, 2019, Defendant Johnson resigned his employment with B&W and started working for Defendant XS.

48.    On September 16, 2019, Defendant Johnson sent an email to customers clients, and/or employees of Plaintiff, which stated:

> **I left B& W this morning. I have now started working at XS Brokers.** We will be doing the same thing that we did at Burns. However, **XS has better systems and better technical support.** So now **you will be getting your policies and endorsements quicker.** Additionally they have the same markets plus a few others as my old employer. I have attached the new agency paperwork. **I hope that we can continue our run together.** Let me know your schedule over the next couple weeks. I would live to come take you out to lunch.

49.    Defendant Johnson's attempt to solicit Plaintiff's customers on the same day that he ended his employment with Plaintiff is a clear and egregious violation of the non-solicitation provisions of the Johnson IPA with Plaintiff.

50.    Defendant XS also acts as a wholesaler in the insurance industry, both as broker and managing general agent in, among other places, the Atlanta, Georgia area.

51.    Upon information and belief, Defendant Johnson is acting in essentially the same capacity for Defendant as he did for Plaintiff.

52.    Since Defendant Johnson has left the employment of Plaintiff, his new employer has hired away at least one of Plaintiff's employees using confidential and/or proprietary information Defendant Johnson obtained while employed by Plaintiff, and Defendant Johnson has made a number of attempts to solicit other employees to terminate their employment with Plaintiff.

53.   XS, as well, has solicited business from and/or through some of the clients, agents and customers of Plaintiff.

54.   Defendant Johnson actions on behalf of XS in the above-mentioned regard are in violation of his agreement with Plaintiff. (Exhibit C).

55.   Upon information and belief, Defendant Johnson will continue to recruit Plaintiff's employees, customers and clients using confidential and proprietary information obtained while he was employed with Plaintiff, and these customers, clients and employees are very unlikely to return to Plaintiff.

56.   The Johnson IPA provides that the venue of any action regarding the terms and conditions of the agreement is to be the State of Michigan and that Michigan law shall govern the Agreement. (Exhibit C).

57.   Defendant Sheen was employed by B&W as a commercial lines director in the Atlanta, Georgia, area. She worked for B&W for about 21 years.

58.   As consideration for her employment with Plaintiff, and as consideration for receiving a bonus, Defendant Sheen signed an Individual Production Award ("Sheen IPA") agreement with Plaintiff that that contained a Non-Solicitation Agreement. (Exhibit D).

59.   Section 5 of the Sheen IPA states as follows:

    "a.   Confidentiality/Non-Disclosure Obligation.

"i.     Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

\* \* \* \* \*

"d.     Restrictive Covenants. Employee agrees further that in order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

"i.     Non-Solicitation of Company Officers, Employees, or Contractors. Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or

provide services to, or for Employer.

"ii.    Non-Solicitation of Company Clients and Accounts. Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer. For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee had written, quoted or been asked to write or quote contracts and/or policies, facilitated placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer." (Exhibit D).

60.    The Sheen IPA was reasonably necessary to protect the valid business interests of Plaintiff, including, but not limited to, establishment and maintenance of relationships with existing and future customers, clients, employees and insurers. (Exhibit D).

61.    The geographic and temporal restrictions in the Sheen IPA are reasonable under the circumstances. (Exhibit D).

62.    As a result of his position with Plaintiff, and the position's attendant duties and responsibilities, Defendant Sheen became intimately familiar with the pricing of Plaintiff's insurance products, as well as with the identities and particularities of Plaintiff's clients and customers and the terms of employment of Plaintiff's employees.

63.    On or about September 16, 2019, Defendant Sheen resigned her employment with B&W and started working for Defendant XS.

64.    Defendant XS also acts as a wholesaler in the insurance industry, both as broker and managing general agent in, among other places, the Atlanta, Georgia area.

65.    Upon information and belief, Defendant Sheen is acting in essentially the same capacity for Defendant XS as she did for Plaintiff.

66.    Since Defendant Sheen has left the employment of Plaintiff, her new employer has hired away at least one of Plaintiff's employees using confidential and/or proprietary information Defendant Sheen obtained while employed by Plaintiff, and Defendant Sheen has made a number of attempts to solicit other employees to terminate their employment with Plaintiff.

67.   XS, as well, has solicited business from and/or through some of the clients, agents and customers of Plaintiff.

68.   Defendant Sheen actions on behalf of XS in the above-mentioned regard are in violation of his agreement with Plaintiff. (Exhibit D).

69.   Upon information and belief, Defendant Sheen will continue to recruit Plaintiff's employees, customers and clients using confidential and proprietary information obtained while he was employed with Plaintiff, and these customers, clients and employees are very unlikely to return to Plaintiff.

70.   The Sheen IPA provides that the venue of any action regarding the terms and conditions of the agreement is to be the State of Michigan and that Michigan law shall govern the Agreement. (Exhibit D).

## COUNT I

### (CLAIM FOR BREACH OF CONTRACT)

71.   Plaintiff restates the above allegations as though more fully set forth below.

72.   Defendant Epting, Defendant Jennings, Defendant Johnson, and Defendant Sheen entered into binding and enforceable contracts with Plaintiff. (Exhibits A, B, C, and D).

73.   Defendants' actions since their departure from Plaintiff's employment have violated the non-solicitation provisions in their agreements in that Defendants have

gone to work with one of Plaintiff's competitors, and in that Defendants have solicited Plaintiff's employees and insurance products and clients.

74.    These breaches of the Defendants' respective agreements have resulted in substantial damages to Plaintiff, including, but not limited to, lost business and loss of goodwill associated with lost customers, clients and employees, and damage to reputation.

75.    Under an agreement with Plaintiff, Defendant Epting also received advance payment on future bonuses, which he is now required to repay to Plaintiff due to his resignation. The total of the advanced bonuses owed totals approximately $45,000.

76.    Defendants' actions have resulted in lost business and will continue to lead to lost business by Plaintiff in such a fashion that the calculation of the amount of those damages will be difficult to calculate. Defendants' actions have also caused lost goodwill and damage to the reputation of the Plaintiff.

## COUNT II

### (CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

77.    Plaintiff restates the above allegations as though more fully set forth below.

78.    Plaintiff had a reasonable expectation that the services and products it provided to insurers, customers and clients who had insurance business written through Plaintiff would continue to renew that insurance business with Plaintiff.

79.    By Defendants' wrongful, immoral, unethical and/or illegal actions, Defendants have interfered with those relationships and have thus imperiled the continuing relationship between Plaintiff and certain customers, insurers and clients.

80.    As a result of the interference in violation of their respective Non-Solicitation Agreements, Defendants have caused the loss of business with certain customers, clients and insurers, as well as the loss of key employees, the result of which has been a loss of business.

## COUNT III

### (CLAIM FOR INTENTIONAL INTERFERENCE WITH CONTRACT)

81.    Plaintiff restates the above allegations as though more fully set forth below.

82.    Defendant Epting, Defendant Jennings, Defendant Johnson, and Defendant Sheen entered into binding and enforceable contracts with Plaintiff. (Exhibits A, B, C, and D).

83.    The aforementioned contracts contained provisions of non-solicitation and confidentiality, among other provisions.

{K0363830.2}                                    21

84.     Defendant Epting, Defendant Jennings, Defendant Johnson, and Defendant Sheen breached their own respective contracts, including by violating provisions pertaining to non-solicitation and confidential information.

85.     The Defendants had full knowledge of the existence of the contracts attached as Exhibit A, B, C, and D.

86.     The Defendants unjustly instigated the breaches of contract by Defendant Epting, Defendant Jennings, Defendant Johnson, and Defendant Sheen.

87.     Regardless, Defendants instigated the breaches of these contracts for their own financial gain and the financial gain of XS, which is Plaintiff's competitor.

88.     The unjust instigation to breach these contracts is evidenced by at least four of Plaintiff's employees resigning and obtaining employment with Defendant XS within a very close proximity to each other.

89.     The unjust instigation to beach these contracts is further evidenced by Defendants' solicitation of Plaintiff's customers, clients and insurers, including by email.

90.     Upon information and belief, in exchange for Defendant Epting, Defendant Jennings, Defendant Johnson, and Defendant Sheen breaching their contracts, Defendant XS has provided them with employment and compensation.

91.     As a result of the interference with these contracts, Defendants have caused the loss of business with certain customers, clients and insurers, as well as the loss of key employees, the result of which has been a loss of business. Defendants' actions have also caused lost goodwill and damage to the reputation of the Plaintiff.

## COUNT IV

### (CLAIM FOR COMMERICAL DISPARAGEMENT)

92.     Plaintiff restates the above allegations as though more fully set forth below.

93.     Defendants have made false and defamatory statements concerning the Plaintiff, including but not limited to claiming that Plaintiff offers inadequate services or services that are inferior to its competitors.

94.     Defendants have made these false and defamatory statements to third parties without Plaintiff's consent, including to Plaintiff's clients, customers, insurance agents, and/or insureds.

95.     In addition to the statements being false, making such statements is in clear violation of the agreements between the Plaintiff and Defendant Epting, Defendant Jennings, Defendant Johnson, and Defendant Sheen. (Exhibits A, B, C, and D). Regardless, Defendants intentionally made such false statements and intentionally violated their agreements.

96.   Defendant XS knew or should have known that the publication of the information was false and also in violation of the agreements. Regardless, Defendant XS published such false statements intentionally and/or negligently allowed such statements to be published by its employees or agents.

97.   As a result of the disparagement, Defendants have caused the loss of business with certain customers, clients and insurers, as well as the loss of key employees, the result of which has been a loss of business. Defendants' actions have also caused lost goodwill and damage to the reputation of the Plaintiff.

## COUNT V

### (CLAIM FOR INJUNCTIVE RELIEF)

98.   Plaintiff restates the above allegations as though more fully set forth below.

99.   The actions of Defendants have resulted in irreparable harm to Plaintiff in the form of lost goodwill, lost business with customers and agents and loss of valued employees.

100.   The actions of Defendant will continue to result in irreparable harm to Plaintiff in the form of lost clients, accounts, agents and employees and diminished goodwill.

101.   The value of this harm cannot, to a large extent, be calculated with sufficient specificity to allow for the recovery of money damages.

102.   The fact that Defendants have violated their agreements with Plaintiff by going to work with a competitor and soliciting Plaintiff's business and employees for that competitor reveals that Plaintiff will likely prevail on its claim for breach of contract.

103.   The issuance of injunctive relief to enjoin Defendant from soliciting or hiring Plaintiff's employees and/or from soliciting or doing business with any of Plaintiff's customers, clients or insurers would cause less harm to Defendant than the harm that would be caused to Plaintiff in the absence of such relief.

## **RELIEF REQUESTED**

Plaintiff respectfully requests that this Court: (1) enjoin Defendants (and/or their agents, employers, attorneys, representatives or assigns) from soliciting on behalf of XS or any other entity the insurance products of Plaintiff; (2) enjoin Defendants (and/or their agents, employers, attorneys, representatives or assigns) from soliciting and/or hiring any more of Plaintiff's employees, customers, clients or insurers; (3) enjoin Defendants from using any confidential or proprietary information obtained during Defendants' employment with Plaintiff; (4) order that Defendants disclose all Plaintiff's employees with whom they or those acting on her behalf (either directly or indirectly) had contact concerning employment with Defendants and/or any entity other than Plaintiff, whether before or after the

termination of their employment with Plaintiff; (5) order that Defendant disclose all of Plaintiff's customers, clients, agents and insurers with whom Defendants or their agents, employers, attorneys, representatives or assigns have had contact since August 1, 2019; (6) order the return to Plaintiff all documents containing confidential and/or proprietary information that were in Defendants' possession immediately after her departure from Plaintiff's employment; (7) enjoin Defendants from making false or misleading statements regarding the Plaintiff; (8) award to Plaintiff all damages arising from Defendants breach of their respective agreements with Plaintiff, their interference with Plaintiff's prospective economic advantage, their interference with contract, and/or trade disparagement; (9) interest; (10) award to Plaintiff its costs and attorney fees; and (11) award any other relief this Court deems just and equitable.

Respectfully submitted,

KAUFMAN, PAYTON & CHAPA

Dated: October 4, 2019

LAWRENCE C. ATORTHY
(P44751) KAUFMAN, PAYTON &
CHAPA
*Attorneys for Plaintiff*
30833 Northwestern Hwy., Suite 200
Farmington Hills, MI 48334
248.626.5000/fax 248.626.2843
LCAtorthy@kaufmanlaw.com

The undersigned swears and affirms that the allegations in the above complaint are true and accurate to the best of his knowledge, information and belief:

Date: October ___ , 2019       By: _____

                                    Alan Kaufman,
                                    CEO, Burns & Wilcox, Ltd.,

Subscribed and sworn to before me

this ____ day of October, 2019.

_____
Notary Public
_____ County,
State of Michigan
My Commission Expires: 12/29/22

{K0363830.2}                    27

# EXHIBIT A

### BURNS & WILCOX, LTD.
### MANAGER'S CONTRACT

THIS CONTRACT OF EMPLOYMENT is made this <u>1st</u> day of <u>June, 2001</u>   b y <u>James E. Epting, Jr.</u>                        ("Employee") and Burns & Wilcox, Ltd. ("Employer"), a Michigan corporation and supersedes any prior agreement between the parties.

IN CONSIDERATION OF the covenants and promises set forth in this agreement, the parties agree as follows:

1.   <u>Employment</u>: Effective <u>February 10, 1997</u>                       , Employer employs Employee, and Employee accepts employment by Employer upon the terms set forth.

2.   <u>Duties</u>:

(a)     Employee shall be employed as a manager of Employer's <u>Alpharetta, Georgia (Atlanta)</u>      office and perform such functions consistent with that position as Employee may be required to perform in the management and supervision of other branch employees, personal production, marketing and other duties as may from time to time be required by senior management.

(b)     Employee agrees to faithfully, industriously, and to the best of Employee's abilities, experience and talent, perform all duties that may be required pursuant to this Contract. Employee shall devote full time and attention to the business of Employer; however, Employee shall be free to make investments, so long as those investments are in publicly traded securities and do not prejudice the business of Employer, nor restrict Employee's ability to devote full time and attention to the business of Employer and Employee's required duties.

(c)     During the course of Employee's duties, Employee will have access to confidential and proprietary information regarding Employer's business. Employee agrees to safeguard and protect such information. Employee further agrees not to, at any time during Employee's employment or thereafter, furnish or disclose to anyone (other than as directed in the normal course of business to further Employer's interest) such confidential information including, but not limited to, client lists, contract terms, ratings, expirations, renewals, business plans and financial information. Any company records prepared by or in possession of Employee remain the property of Employer, and all copies shall be returned to Employer upon termination of the employment relationship.

(d)     All business developed and handled by Employee, including programs (purchasing group or otherwise), franchise or other regional or national business, during the existence of this employment relationship remain the property of Employer and shall be treated as Employer's proprietary information.

3.   <u>Compensation:</u>

   * Subject to periodic review and modifications.

   (a)   Employee shall receive a salary of $ 64,500 * _____ per year paid biweekly in the same manner as other employees.  Employee shall also receive an automobile allowance of $ 300.00 _____ monthly.

   (b)   Beginning with the second full calendar year of Employee's employment, and each full calendar year thereafter, Employee shall be entitled to a bonus equal to __Ten__ percent (____10_%) of the pre-tax profits (adjusted for amortization) of the branch resulting from business written and bound during the preceding calendar year and collected on or before the last day of February of the following year.  Any amount collected after the final day of February as a result of business written in a prior calendar year will be applied to the pre-tax profits accumulated during the year in which the amount is collected. By way of example, if business is written and bound in calendar year 2000, but is collected in March 2001, then the amount collected shall be used to calculate profits for calendar year 2001, and not calendar year 2000. The bonus payable under this provision shall be paid on or before March 31 of each year, for the preceding calendar year, providing Employee is still employed on that date or has become separated from employment by that date other than by resignation or for cause.

   (c)   Employer shall deduct any applicable federal, state and local withholding, social security, and other appropriate taxes from all compensation paid to, or provided by Employer for Employee.

4.   <u>Vacation, Holidays and Benefits:</u>

   (a)   Employee shall be entitled to __Ten   (10)____ paid vacation days and __Five (5)____ paid sick days.

   (b)   Employee shall be entitled to such other fringe benefits as Employer, at its discretion, provides other managers.  In determining all other such benefits, Employee's service with Employer will be considered to have begun on _February 10, 1997_

5.   <u>Non-Piracy/Competition:</u>  During Employee's employment with Employer, and for one year following the last day of the month of termination of this employment relationship, Employee will not directly or indirectly, nor allow any other person or organization to directly or indirectly use any confidential information (including, but not limited to, client lists, contract terms, ratings, expirations, renewals, business plans and/or financial information) belonging to employer.

   •   Employee shall not, directly or indirectly, at any time use or disclose to any person or organization any trade secrets or other confidential information relating to the Burns & Wilcox, Ltd. business.  Employee shall not take any action that will cause the termination of the business relationship between Burns & Wilcox, Ltd. and any customer or supplier to Burns & Wilcox, Ltd.  Employee also shall not solicit for employment any person employed in the Burns & Wilcox, Ltd business.

● Employee acknowledges that if Employee violates this paragraph 5, Employee will cause severe and irreparable injury to Burns & Wilcox, Ltd. its business and good will, an injury that is not adequately compensable by money damages. Accordingly, in the event of a breach (or threatened or attempted breach) of this paragraph 5, Burns & Wilcox, Ltd. shall, in addition to any other rights and remedies, be entitled to immediate appropriate injunctive relief, or a decree of specific performance of this agreement, without the necessity of showing any irreparable injury or special damages.

If this agreement shall be held by a court to be invalid or unenforceable because it is too broad in any respect, the agreement shall be narrowed by the court to the extent required to be enforceable.

Any action for injunctive or other relief under this paragraph 5 shall be venued in the Federal Court for the Eastern District of Michigan.

6.   **Termination by Employer:**

(a)   **Without Cause:** Employee acknowledges that this is an at-will employment agreement that may be terminated at any time by Employer without cause. Employee shall be entitled to _____ One _____ ( 1 ) week(s) salary for each year of actual service up to a maximum of ~~Eight-twelve~~ ( 12 8 ) week(s) salary in the event of termination without cause. Such salary continuation shall be paid in the same manner and at the same intervals as Employer's regular payroll. In addition, Employer shall continue Employee's then existing health benefits, if any, for the same period.

(b)   **With Cause:** Employee's employment may be terminated for cause, upon written notice to Employee. For purposes of this provision "cause" shall be defined as the following: (i) dishonesty, fraud, misappropriation or embezzlement; (ii) commission of a felony; (iii) disability as defined in Paragraph 6(c); (iv) consistent failure to satisfactorily perform and discharge Employee's duties; (v) absences, for reasons other than disability exceeding 40 days in a calendar year; or (vi) material violation or material breach of any of the provisions of this Agreement.

As of the effective date of the termination of Employee's employment pursuant to this section, Employer's payment of salary and benefits to Employee shall cease, and no salary, bonus or benefits shall be due or owing from the date of termination forward. However, Employee may continue his/her insurance benefits as provided by COBRA.

(c)   **Disability:** If Employee becomes disabled while employed by Employer (which shall be defined to include any illness, injury, or other incapacity that prevents Employee from performing any of the duties required of him/her pursuant to Section 2 of this Agreement on a full-time basis for (a) ninety (90) or more consecutive calendar days following the date the disability begins, (b) eighty (80) or more working days in a 12-month period; or (c) one hundred (100) or more working days in a 24-month period, Employee's employment may be terminated.

3

Employee shall be entitled to disability benefits as provided other employees of Employer and more fully described in Employer's Personnel Policy Handbook and Employee Benefits Manual.

7. <u>Termination by Employee</u>: Employee may terminate employment with Employer, at any time, upon twenty-one (21) calendar days written notice to Employer. As of the effective date of the termination, Employee's last day worked, Employer's payment of salary and benefits to Employee shall cease and Employee shall have no entitlement to salary, benefits or bonuses under this agreement beyond the effective date of the written notice. However, Employee may continue the then existing insurance benefits, if any, as provided by COBRA. The provisions of Paragraph 5 apply to all terminations by Employee.

8. <u>Compensation Upon Termination by Death</u>: Upon Employee's death, this Agreement shall end, except Employer shall pay to Employee's estate the salary otherwise payable to Employee under Paragraph 3(a) until the end of the month in which his death occurs. Employee's estate should also be entitled to any bonus earned, as of the date of Employee's death.

9. <u>Notices</u>:

(a) Any notice required by this Agreement to be given to the Employer shall be in writing and delivered or mailed, certified, to its principal office, addressed to its president, marked "Personal and Confidential".

(b) In the case of Employee, any such notice shall be delivered or mailed to Employee's last known address as reflected in the records of the Employer.

10. <u>Binding Effect</u>: This Agreement shall inure to the benefit of and shall be binding upon the parties, their successors, assigns, or personal representatives. However, Employee may not transfer or assign his obligations under this Agreement.

11. <u>Arbitration</u>: Except as provided in paragraph 5, any legal dispute arising between the parties relating to the construction, interpretation, enforceability, performance or breach of this agreement and any claim arising out of the employment for discrimination, wrongful discharge, or alleged breach of any state or federal law regarding the terms, condition or termination of employment shall be exclusively and finally settled by arbitration under the Rules of the American Arbitration Association. Arbitration will be initiated by the delivery of a written demand for arbitration by one party to the other within a reasonable time after the dispute has arisen, but in no event later than six (6) months later than accrual of any claim under this contract.

Arbitration hearing shall be held at a mutually agreed location in Metropolitan Detroit, Michigan area.

12. <u>Governing Law</u>: This Agreement shall be governed by and construed and enforced in accordance with the laws of Michigan.

4

13.   **Entire Agreement:**  This Agreement constitutes the entire agreement between the parties on the subject of Employee's employment by Employer, and there are no other promises or obligations except as contained in this Agreement.  This Agreement may be amended only by a writing executed by the parties.

14.   **Waiver:**  Failure to insist upon strict compliance with any term or condition of this Agreement shall not constitute a waiver of such term or condition, nor shall any waiver or relinquishment of any right or power under this Agreement at any one or more times be deemed a waiver or relinquishment of such right or power at any other time.

Witness:                                        Burns & Wilcox, Ltd.

_Sheryl S. Byrd_                         By: _James E. Gatzig Jr._

                                                Its: _____

                                                Date: _6-5-01_

                                                "Employee"

_Bonnie Bozel_                          _H S Alla_

                                                Date: _6/7/01_

a-l-d\f\wpd\J-A\B&W\Managers Contract 1

5

# EXHIBIT B



## INDIVIDUAL PRODUCTION AWARD

Burns & Wilcox, Ltd. [1], a Michigan corporation ("Employer") wishes to link a portion of Employee (defined herein) compensation to Employee production, creating an incentive for Employee to increase his or her production. Therefore, it is agreed that the Employer will pay the Employee, in addition to his or her annual salary, a Bonus (defined herein) which shall be calculated in accordance with the schedule set forth in the Addendum subject to the terms and conditions set out herein. Although this Individual Producer Award Agreement is continuously binding upon the Employee throughout his or her entire employment with the Employer and need not be annually re-executed, re-signed, or renegotiated to be enforceable and binding, the Addendum shall be re-signed by the Employer and the Employee once annually, and may be amended at that time. The Individual Producer Award and the ancillary Addendum that is in effect during any period shall be referred to as the "Agreement" for the purposes of that Period.

1. **DEVELOPMENT AND PAYMENT RECORD**

    a. **Timing of Payment Calculation.** The Performance Award, as defined in the Addendum, shall be paid to eligible employees in the time, manner and calculation as set forth in the attached Addendum. Any other bonuses that may be payable to Employee are set forth in the Addendum. In the Agreement, the Performance Award and any other bonus otherwise set forth in the Addendum shall be referred to collectively as the "Bonus."

    b. **Timing of Payment.** Final computation and payment of the Performance Award shall occur within 75 days following the close of the applicable Performance Period (defined herein) in which it is earned. Any other bonus that may be due to Employee shall be paid within the time period set forth in the Addendum to this Agreement.

2. **ELIGIBILITY CRITERIA**

    In addition to the other eligibility criteria set out herein, to be eligible under this Agreement to receive any Bonus, the Employee must:

    a. be actively employed by Employer at the time the Bonus is paid;

    b. be properly licensed to transact insurance business as required by all applicable laws during the entirety of the Performance Period for which any Bonus is to be earned;

    c. re-sign the Addendum to this Agreement, as amended by Employer, within 10 days of the commencement of the applicable Performance Period, as defined in the Addendum;

---

[1] The parties agree that all references to Employer, Company, or H.W. Kaufman Financial Group, Inc. in this Agreement shall include Burns & Wilcox, Ltd., AJK Enterprises, Inc., AJK Holdings, LLC, AJK Toronto, Ltd. and AJK London, LLC and all of their owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, corporate subsidiaries, parents, brother companies, affiliates, (and agents, directors, officers, employees, representatives and attorneys, of said subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them. Any reference to "Burns & Wilcox" in this Agreement, moreover, shall refer to Burns & Wilcox, Burns & Wilcox Brokerage and Burns & Wilcox, Ltd.

Revised November 2018

d.   produce or receive credit from Employer for the production of earned income greater than or equal to the "Minimum Earned Income" as defined in the Addendum;

e.   produce or receive credit from Employer for the production of earned income from new business greater than or equal to the minimum "New Business Income" as defined in the Addendum; and

f.   have executed an agreement similar to this Agreement.

3.   **DEFINITION AND METHOD OF CALCULATION**

a.   **Definition of Performance Period.** "Performance Period" shall be defined as set forth in the Addendum.

b.   **Definition of Earned Income.** "Earned Income" shall be defined as "Total Earned Income", as used in Employer's generally accepted business practices, produced by Employee during the Performance Period, as reported by Employer's records. Adjustments to "Total Earned Income" shall include the following.

   i.   The cost of inspections and audits, as well as other pass-through expenses shall be deducted from Earned Income in the Performance Period in which the costs are incurred;

   ii.   Earned income credit from the Referral Program," as defined by Employer, shall be included in Employee's Earned Income;

   iii.   Earned income generated from non-carrier suppliers on the non-carrier supplier excluded list shall be deducted from Employee's Earned Income; and

   iv.   Any overage for any inspection or audit shall not be included in Earned Income or Total Earned Income.

c.   **Definition of New Business Income.** "New Business Income" shall be defined as the "Total Earned Income" or "Net Retained" from new business produced by Employee during the Performance Period, as reported by Employer's records, less any applicable returns related to the new business generated, subject to the following requirements.

   i.   New Business Income shall be new with respect to both the Employer and the Employee.

   ii.   New Business Income shall not include income from any merger or acquisition by Employer or any of Employer's parent, sister or subordinate entities.

   iii.   New Business includes new business income generated through the Referral Program.

d.   **Definition of Salary.** The term "Salary" as used in this Agreement and the Addendum shall refer only to Employee's standard wages during any applicable Performance Period. "Salary" shall not include and Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

2

c.     **Holdback for Possible Inability to Collect Premium or Fees.** A percentage of each Bonus that is earned shall be held back to protect Employer from potential inaccuracies in the Bonus calculation resulting from returns, cancellations, uncollected premiums or other unusual circumstances. The amount of the holdback shall be 10% of the Bonus otherwise earned in any applicable Performance Period.   To the extent not exhausted by returns cancellations, uncollected premiums or other unusual circumstances, the retained amounts shall be added, in full, to Employee's Bonus payment for the next consecutive Performance Period, provided that Employee is employed by Employer at the time the next consecutive Bonus payment is due.

4.   **TERMINATION OF EMPLOYMENT**

a.     **Definition of Termination Date.** "Termination Date" shall mean the date upon which the Employee ceases to be employed by the Employer and does not include any period following the date on which an Employee is notified that his or her employment or services are terminated during which the Employee is eligible to receive any statutory, contractual or common law notice or compensation in lieu thereof or severance payments unless the Employee is actually required by the Employer to provide services during such notice period. In the event of death or disability of Employee while still employed by Employer, the "Date of Termination" shall be the date of the Employee's death or the date upon which the Employee becomes terminated and is unable to return to Employee's prior duties and responsibilities with Employer.

b.     **Death or Disability Pro Rata Bonus.** If Employee's employment is terminated for reason of death or disability, Employee or his or her estate or its beneficiaries shall be entitled to receive a "Pro-rata Bonus" payable no later than 90 days following the conclusion of the Performance Period in which the termination occurs.  For purposes of this Agreement, "Pro-rata Bonus" shall be calculated by multiplying the Minimum Earned Income, Minimum New Business Income, and Production Ranges, as set forth in the Addendum, by a fraction, the numerator of which is the number of days elapsed in the Performance Period through the Termination Date and the denominator of which is 183.

c.     **Applicability of this Provision.** The provisions of this section shall apply irrespective of whether the Employee's employment was terminated lawfully or unlawfully and notwithstanding any notice of termination or pay in lieu of notice to which the Employee may be entitled or any payment made to the Employee by way of salary continuance or otherwise.

5.   **NON-SOLICITATION; NON-COMPETITION; CONFIDENTIAL INFORMATION AND NON-DISCLOSURE**

a.     **Confidentiality/Non-Disclosure Obligation.**

i.     Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

3

ii.     Employee acknowledges, however, that Employer has, in this provision, given Employee notice that, pursuant to federal law, an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret: (i) made in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

b.     **Return of Company Property.**  Employee agrees that all Confidential Information, whether embodied in hard copy, electronic media, or other forms, or copies thereof, is the property of Employer exclusively.  Employee agrees that upon the termination or cessation of Employee's employment with Employer, whether voluntary or involuntary, that Employee will immediately return to Employer all Confidential Information, Company property, and client property, in any form, including, but not limited to, hard copy and electronic form, and in any media in which such information is recorded or stored, including electronically on any electronic storage device of any kind.  Employee agrees that Employee shall acquire no property rights or claim to the Confidential Information or any other property of Employer or its clients. Employee agrees and acknowledges that any Confidential Information given to Employee by Employer or that Employee is permitted to use for Employee's employment Employer remains Employer's property and that Employee has no right to keep such things, use them for non-Company use, retain them upon Employee's termination or cessation of Employee's employment with Employer, or use them in competition against Employer at any time.

c.     **Proprietary Rights and Works For Hire.**  Employee agrees that all work and creation of work products associated with this Agreement or Employee's employment with Employer during Employee's employment are deemed works for hire for Employer.  In consideration of employment with Employer, Employee assigns and transfers to Employer all rights of any kind and nature (including without limitation any royalties, other income, and property rights) in discoveries, inventions, patentable material, copyrightable materials, designs, methods, and any other work products whatsoever. Employee further agrees that Employee shall cause to be furnished to Employer such instruments, instructions, and documentation as Employer may reasonably require to ensure that the aforesaid rights shall belong to Employer upon request or at the end of Employee's employment.  Employee shall return all proprietary information to Employer.  Employee also agrees and understands that Employee cannot use as a defense to any improper misappropriation or retention of trade secrets that Employee thought Employee was entitled to use or retain such trade secrets because Employee created it or assisted in creating it.

d.     **Restrictive Covenants.**  Employee agrees further that in order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

i.     **Non-Solicitation of Company Officers, Employees, or Contractors.**  Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or provide services to, or for, Employer.

4

ii.   **Non-Solicitation of Company Clients and Accounts.**  Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer. For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee had written, quoted or been asked to write or quote contracts and/or policies, facilitated placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer.

iii.   **Non-Competition.**  During Employee's employment with Employer, Employee shall not directly or indirectly engage in any action or provide support, assistance or services to any other person or entity, if such activity would constitute competition with Employer's business. This proscription shall not apply to solely passive investments to which Employee provides no advisory, consulting, employment or solicitation services.

e.   **Irreparable Harm.**  Employee acknowledges that Employer has a legitimate need to protect itself from improper or unfair competition and to protect its Confidential Information, as well as Employer's client and account relationships with both its prospective and existing clients and accounts, to protect its client goodwill, and that the restrictions contained in this Agreement are reasonable and necessary to protect Employer's operations, legitimate competitive interests, and Confidential Information.  Employee also recognizes the highly competitive nature of Employer's business and that irreparable harm would be caused by Employee's violation of the restrictions contained herein.

f.   **Remedies/Damages.**  Employee agrees that Employer's remedies at law for any violation of this Agreement are inadequate and that Employer has the right to seek injunctive relief in addition to any other remedies available to it. Therefore, if Employee breaches this Agreement, Employee agrees that Employer has the right to, and may seek issuance of a court-ordered temporary restraining order, preliminary injunction and permanent injunction, as well as any and all other remedies and damages, including monetary damages. In the event that Employee breaches this Agreement after the termination or expiration of Employee's employment, whether voluntary or involuntary, the two (2) year time period set forth in this Section 5 shall be tolled during the period of Employee's non-compliance or violation in order to provide Employer with the full restricted period to which it is entitled under this Agreement.

g.   **Duty to Disclose Agreement and to Report New Employer.**  Employee acknowledges that Employer has a legitimate business purpose in the protection of its trade secrets, proprietary information, competitive position, methods of operation, processes, procedures and vendors.  Employee also recognizes and agrees that Employer has the right to such information as is reasonably necessary to inform Employer whether the terms of this Agreement are being complied with.  Accordingly, Employee agrees that for a period of two (2) years following Employee's termination of employment, Employee will promptly and forthrightly provide any new employer with a copy of this Agreement and notify the new employer of Employee's obligations contained in this Agreement.

6. **TERMINATION AND WAIVER OF JURY TRIAL**.

   Employee agrees to bring any claims that Employee may have against Employer within 180 days of the day that Employee knew, or should have known, of the facts giving rise to the cause of action and waive any longer, but not shorter, statutory or other limitations periods. This includes, but is not limited to, the initial filing of a charge with the Equal Employment Opportunity Commission and/or state equivalent civil rights agency. However, Employee understands that Employee will thereafter have the right to pursue any federal claim in the manner prescribed in any right to sue letter that is issued by an agency. Employer further agrees to waive any right to a jury trial in action commenced by Employee or Employer that arises under this Agreement.

7. **GENERAL PROVISIONS**

   a.    **Maintenance of Records.** Employer will be responsible for maintaining all appropriate records. Any Bonus due will be calculated according to Employer's records.

   b.    **Taxation of Bonus.** Any payments made to the Employee pursuant to this Agreement will be subject to all applicable withholdings under applicable law, including on account of income taxes. Any and all taxes payable in respect of any payment under this Agreement (including any penalties, fines or interest arising therefrom) shall be the sole responsibility of the Employee. The Employer shall, to the extent permitted by law, have the right to deduct from any payment any federal, provincial, foreign and local laws relating to the withholding of tax or other levies on employment compensation in relation to payments contemplated in this Agreement.

   c.    **No Fiduciary Duty.** Nothing contained in the Agreement and no action taken pursuant to the Agreement shall create or be construed to create a trust of any kind or any fiduciary relationship between the Employer and the Employee or other persons.

   d.    **Reasonable Interpretation and Modification.** The provisions of this Agreement are intended to be interpreted and construed in a manner so as to make such provisions valid, binding and enforceable. In the event that any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, then such provision shall be deemed to be modified to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted in a manner so as to make such provision valid, binding and enforceable, then such provision shall be deemed to be excised from this Agreement and the validity, binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

   e.    **Employer Modification of Agreement.** The Employer reserves the right to modify or terminate the Agreement at any time in its sole discretion provided that such change or termination shall not impair the rights of the Employee accrued under the Agreement as at the effective date of the change.

   f.    **No Guaranty of Employment.** This Agreement shall not constitute a condition of employment nor a commitment on the part of the Employer to ensure the continued employment of the Employee. Nothing in the Agreement shall confer upon an Employee any right to continue in the employ of the Employer or affect in any way the right of the Employer to terminate his or her employment at any time.

   g.    **Forfeiture of Bonus.** Notwithstanding any other provision of the Agreement, in addition to other action as may be taken by the Employer, where an Employee's performance is deemed to be unsatisfactory, the Bonus otherwise payable under the Agreement for the Performance Period may be forfeited in its entirety such that no payment will be made under the Agreement or reduced in part.

h.    **Prior Agreements Inoperative.**  This Agreement represents the entire agreement between the parties, and it shall supersede any and all prior written and oral agreements covering its subject matter. By way of example, but not by way of limitation, all prior bonus agreements between Employee and Employer, including, but not limited to, any prior Incentive Plan Agreements, are null and void.

i.    **Choice of Law and Venue.**  This Agreement is made in Michigan and shall be governed in all respects under the laws of the State of Michigan without respect to any other state's choice of law rules, statutes or regulations.  Venue of any action regarding the terms and conditions of this Agreement or any action arising under this Agreement shall be brought in the State courts of Michigan in Oakland County, Michigan or in the Federal court for the Eastern District of Michigan, Southern Division. Employee waives any objections Employee may have to lack or personal jurisdiction or venue in any Michigan court. Both parties hereby waive any defense to lack of jurisdiction, improper forum, forum *non conveniens*, or improper venue, and waive any right to attempt to seek a change of venue or change of forum in the event an action is properly filed in the State of Michigan.

j.    **Understanding of Agreement.**  Employee acknowledges that it has read and understood the terms and conditions of this Agreement and acknowledges and agrees that it has had the opportunity to seek and was not prevented nor discouraged by the Employer from seeking any  independent legal advice which it considered necessary prior to the execution and delivery of this Agreement and that, in the event that it did not avail itself of that opportunity prior to signing this Agreement, it did so voluntarily without any undue pressure, and agrees that its failure to obtain independent legal advice will not be used by it as a defense to the enforcement of its obligations under this Agreement.

k.    **Entire Agreement.**  This Agreement represents the entire understanding between Employee and Employer regarding its contents and supersedes any prior or contemporaneous agreements, and any such prior or contemporaneous agreements are hereby integrated herein.  Any alteration, modification, or waiver of any provision of this Agreement shall not be valid unless in writing and signed by all parties.

l.    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Employer and its respective successors and assigns, and upon Employee and any of Employee's heirs, personal representatives, and assigns, except that Employee's duties hereunder may not be delegated or assigned.

m.    **Survival.**  Sections 5, 6 and 7 of this Agreement shall survive the termination of this Agreement.

n.    **No Conflict and Non-Use.**  Employee acknowledges and agrees that Employee is not subject to any other agreement or restriction from a prior employer or any other entity that prohibits Employee's employment or association with Employer Company or with Employee's execution of this Agreement. Employee acknowledges and agrees that Employee shall not use, disclose, share, or in any way misappropriate the trade secrets of any prior employers for the benefit of Employer or for use at Employer. Employee understands that Employer prohibits the improper use of any other company's trade secrets for use of Employee's employment with Company, and that Employer has no obligation to defend Employee if an action for such misappropriation or improper use of trade secrets is brought against Employee by any former employer or any other party.  Any such improper use or misappropriation of trade secrets is not, and Employee recognizes and acknowledges that it is not, within the scope of Employee's employment, and if doing so, Employee will not be doing so as the agent of Employer, but such acts will be deemed to be outside the scope of Employee's employment with Employer.

o.    **Execution and Counterparts.**  This Agreement may be executed in counterparts and any copies, facsimiles, or electronic transmissions or scans shall be treated as originals.

7

This Agreement is between:

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and

_____
(hereinabove and hereinafter designated as the "Employee")


**EMPLOYER**                                    **EMPLOYEE**

_____          _____
Signature                                         Signature

_____          _____
Name                                              Name

_____          _____
Title                                             Title

Date: _____, _____          Date: _____, _____



## ADDENDUM TO INDIVIDUAL PRODUCTION AWARD

During the period this Addendum is in effect, Employee shall be eligible to be paid a Performance Award, as defined below. The Performance Award and any other bonus that may be payable to Employee under this Addendum, if any, shall be calculated using the formula set forth in this Addendum and shall be collectively referred to herein as the "Bonus.".

1.  For each of the two semi-annual Performance Periods in 2019, Employee's Minimum Earned Income shall be calculated as [ 1.00 ] times the Employee's annual Salary [ $60,000 ] as of the commencement of the first Performance Period., or $[ 60,000 ], divided by 2, amounting to [ 30,000 ] for each of the two semi-annual Performance Periods ("Performance Award").

2.  For each of the two semi-annual Performance Periods in 2019, Employee's New Business Income must exceed $[ 50,000 ] ("Minimum New Business Income") to qualify for a Performance Award under this Agreement.

3.  For each of the two semi-annual Performance Periods in 2019, Employee shall be entitled to a Performance Award calculated in accordance with the following commission schedule.

| Commission Rate | Production Range (Earned Income) |
|---|---|
| 10% | Minimum to $225,000 |
| 15.0% | >$225,000 to $300,000 |
| 17.5% | >$300,000 to $375,000 |
| 20.0% | >$375,000 to $500,000 |
| 25.0% | >$500,000 to $1,000,000 |
| 30.0% | >$1,000,000 to $1,250,000 |
| 35.0% | >$1,250,000 and greater |

4.  If Employee's Minimum Earned Income exceeds the upper end of the production range for a level, the levels that are exceeded shall not be applicable to the calculation of the Performance Award. In such instances, the Minimum Earned Income shall constitute the lower end of the production range for the next applicable level. Employee shall be eligible only for a Performance Award payable at the Commission Rate for the tier into which Employee's Earned Income falls.

5.  Employee shall only be entitled to receive a Bonus as set forth in this Addendum if Employee has executed an Individual Production Award Agreement.

6.  The term "Salary" as used in this Agreement and Addendum shall refer only to Employee's standard wages during any applicable Performance Period. "Salary" shall not include any Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

7.  In addition to the Performance Award set forth above in this Addendum, Employee may be eligible for an annual bonus calculated in accordance with the following schedule and based upon the New Business Minimum ("New Business Award"). To qualify for a New Business Award, Employee's New Business Income must meet or exceed the product that is two times Employee's Minimum New Business Income ("New Business Award Threshold"). If the New Business Income Targets set forth

below are met, the Employee shall be eligible to receive the amount set forth in the brackets in the table below. These amounts set forth in the table below are cumulative. Employee shall receive the bracketed New Business Bonus for each New Business Income Target Employee reaches in a given calendar year. This New Business Income will be paid in addition to the Performance Award outlined above in this Addendum. All New Business Bonuses attributable to all New Business Income Targets that Employee meets will be paid on or before March 15 of the year after the New Business Bonus was earned, subject to Section 2 of the Individual Production Award Agreement.

| Annual Minimum New Business | Target 1 New Business Income [Additional Bonus] | Target 2 New Business Income [Additional Bonus] | Target 3 New Business Income [Additional Bonus] |
|---|---|---|---|
| 100,000 (2 x $50,000) | 175,000 [2,500] | 250,000 [5,000] | 350,000 [7,500] |
| 130,000 (2 x $65,000) | 250,000 [5,000] | 350,000 [7,500] | 500,000 [12,500] |
| 160,000 (2 x $80,000) | 350,000 [7,500] | 500,000 [12,500] | 750,000 [15,000] |
| 190,000 (2 x 95,000) | 350,000 [7,500] | 500,000 [12,500] | 750,000 [15,000] |

**This Agreement is between:**

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and

Griffin Jennings
_____

(hereinabove and hereinafter designated as the "Employee")

**EMPLOYER**

*James Epting*
_____
Signature

James Epting
_____
Name

Senior Vice President
_____
Title

                12/19/2018
Date: _____

**EMPLOYEE**

*Griffin Jennings*
_____
Signature

Griffin Jennings
_____
Name

Commercial Lines Underwriter
_____
Title

                12/19/2018
Date: _____



## ADDENDUM TO INDIVIDUAL PRODUCTION AWARD

If Employee meets the minimum New Business Income requirement, outlined in item #2 on page 1 of the Individual Production Award Addendum, Employee is guaranteed a minimum bonus of $5,000 for each semi-annual Performance Period.

**EMPLOYEE**

*Griffin Jennings*
_____
Signature

Griffin Jennings
_____
Print Name

Date: _____12/19/2018_____ _____, 20____

**EMPLOYER**

*James Epting*
_____
Signature

James Epting
_____
Print Name

Date: _____12/19/2018_____ _____, 20____

 **InsureSign Document Completion Certificate**

Document Reference    : ef6916a9-8026-4ee3-9d67-4dcfb17c5d9c12964
Document Title        : Jennings 2019 addendum revised
Document Region       : Northern Virginia
Sender Name           : James Epting
Sender Email          : jeepting@burns-wilcox.com
Total Document Pages  : 3
Secondary Security    : Not Required
Participants

1. Griffin Jennings (grjennings@burns-wilcox.com)
2. James Epting (jeepting@burns-wilcox.com)

## Document History

| Timestamp | Description |
|---|---|
| 12/19/2018 11:08AM EST | Document sent by James Epting (jeepting@burns-wilcox.com). |
| 12/19/2018 11:08AM EST | Email sent to Griffin Jennings (grjennings@burns-wilcox.com). |
| 12/19/2018 11:08AM EST | Email sent to James Epting (jeepting@burns-wilcox.com). |
| 12/19/2018 13:35PM EST | Document viewed by Griffin Jennings (grjennings@burns-wilcox.com). 63.85.131.9 Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko |
| 12/19/2018 13:37PM EST | Griffin Jennings (grjennings@burns-wilcox.com) has agreed to terms of service and to do business electronically with James Epting (jeepting@burns-wilcox.com). 63.85.131.9 Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko |
| 12/19/2018 13:37PM EST | Signed by Griffin Jennings (grjennings@burns-wilcox.com). 63.85.131.9 Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko |
| 12/19/2018 13:38PM EST | Email sent to James Epting (jeepting@burns-wilcox.com). |
| 12/19/2018 14:11PM EST | Document viewed by James Epting (jeepting@burns-wilcox.com). 73.106.74.216 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/19/2018 14:11PM EST | James Epting (jeepting@burns-wilcox.com) has agreed to terms of service and to do business electronically with James Epting (jeepting@burns-wilcox.com). 73.106.74.216 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/19/2018 14:11PM EST | Signed by James Epting (jeepting@burns-wilcox.com). 73.106.74.216 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/19/2018 14:11PM EST | Document copy sent to James Epting (jeepting@burns-wilcox.com). |

## Document History

| Timestamp | Description |
|---|---|
| 12/19/2018 14:11PM EST | Document copy sent to Griffin Jennings (grjennings@burns-wilcox.com). |

# EXHIBIT C



## INDIVIDUAL PRODUCTION AWARD

Burns & Wilcox, Ltd. [1], a Michigan corporation ("Employer") wishes to link a portion of Employee (defined herein) compensation to Employee production, creating an incentive for Employee to increase his or her production. Therefore, it is agreed that the Employer will pay the Employee, in addition to his or her annual salary, a Bonus (defined herein) which shall be calculated in accordance with the schedule set forth in the Addendum subject to the terms and conditions set out herein. Although this Individual Producer Award Agreement is continuously binding upon the Employee throughout his or her entire employment with the Employer and need not be annually re-executed, re-signed, or renegotiated to be enforceable and binding, the Addendum shall be re-signed by the Employer and the Employee once annually, and may be amended at that time. The Individual Producer Award and the ancillary Addendum that is in effect during any period shall be referred to as the "Agreement" for the purposes of that Period.

1. **DEVELOPMENT AND PAYMENT RECORD**

    a. **Timing of Payment Calculation.** The Performance Award, as defined in the Addendum, shall be paid to eligible employees in the time, manner and calculation as set forth in the attached Addendum. Any other bonuses that may be payable to Employee are set forth in the Addendum. In the Agreement, the Performance Award and any other bonus otherwise set forth in the Addendum shall be referred to collectively as the "Bonus."

    b. **Timing of Payment.** Final computation and payment of the Performance Award shall occur within 75 days following the close of the applicable Performance Period (defined herein) in which it is earned. Any other bonus that may be due to Employee shall be paid within the time period set forth in the Addendum to this Agreement.

2. **ELIGIBILITY CRITERIA**

    In addition to the other eligibility criteria set out herein, to be eligible under this Agreement to receive any Bonus, the Employee must:

    a. be actively employed by Employer at the time the Bonus is paid;

    b. be properly licensed to transact insurance business as required by all applicable laws during the entirety of the Performance Period for which any Bonus is to be earned;

    c. re-sign the Addendum to this Agreement, as amended by Employer, within 10 days of the commencement of the applicable Performance Period, as defined in the Addendum;

---

[1] The parties agree that all references to Employer, Company, or H.W. Kaufman Financial Group, Inc. in this Agreement shall include Burns & Wilcox, Ltd., AJK Enterprises, Inc., AJK Holdings, LLC, AJK Toronto, Ltd. and AJK London, LLC and all of their owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, corporate subsidiaries, parents, brother companies, affiliates, (and agents, directors, officers, employees, representatives and attorneys, of said subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them. Any reference to "Burns & Wilcox" in this Agreement, moreover, shall refer to Burns & Wilcox, Burns & Wilcox Brokerage and Burns & Wilcox, Ltd.

Revised November 2018

d.      produce or receive credit from Employer for the production of earned income greater than or equal to the "Minimum Earned Income" as defined in the Addendum;

e.      produce or receive credit from Employer for the production of earned income from new business greater than or equal to the minimum "New Business Income" as defined in the Addendum; and

f.      have executed an agreement similar to this Agreement.

3.    **DEFINITION AND METHOD OF CALCULATION**

a.      **Definition of Performance Period.**  "Performance Period" shall be defined as set forth in the Addendum.

b.      **Definition of Earned Income.**  "Earned Income" shall be defined as "Total Earned Income", as used in Employer's generally accepted business practices, produced by Employee during the Performance Period, as reported by Employer's records. Adjustments to "Total Earned Income" shall include the following.

   i.      The cost of inspections and audits, as well as other pass-through expenses shall be deducted from Earned Income in the Performance Period in which the costs are incurred;

   ii.      Earned income credit from the Referral Program," as defined by Employer, shall be included in Employee's Earned Income;

   iii.      Earned income generated from non-carrier suppliers on the non-carrier supplier excluded list shall be deducted from Employee's Earned Income; and

   iv.      Any overage for any inspection or audit shall not be included in Earned Income or Total Earned Income.

c.      **Definition of New Business Income.**  "New Business Income" shall be defined as the "Total Earned Income" or "Net Retained" from new business produced by Employee during the Performance Period, as reported by Employer's records, less any applicable returns related to the new business generated, subject to the following requirements.

   i.      New Business Income shall be new with respect to both the Employer and the Employee.

   ii.      New Business Income shall not include income from any merger or acquisition by Employer or any of Employer's parent, sister or subordinate entities.

   iii.      New Business includes new business income generated through the Referral Program.

d.      **Definition of Salary.**  The term "Salary" as used in this Agreement and the Addendum shall refer only to Employee's standard wages during any applicable Performance Period. "Salary" shall not include and Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

2

e.      **Holdback for Possible Inability to Collect Premium or Fees.**  A percentage of each Bonus that is earned shall be held back to protect Employer from potential inaccuracies in the Bonus calculation resulting from returns, cancellations, uncollected premiums or other unusual circumstances. The amount of the holdback shall be 10% of the Bonus otherwise earned in any applicable Performance Period.   To the extent not exhausted by returns cancellations, uncollected premiums or other unusual circumstances, the retained amounts shall be added, in full, to Employee's Bonus payment for the next consecutive Performance Period, provided that Employee is employed by Employer at the time the next consecutive Bonus payment is due.

4.    **TERMINATION OF EMPLOYMENT**

a.      **Definition of Termination Date.** "Termination Date" shall mean the date upon which the Employee ceases to be employed by the Employer and does not include any period following the date on which an Employee is notified that his or her employment or services are terminated during which the Employee is eligible to receive any statutory, contractual or common law notice or compensation in lieu thereof or severance payments unless the Employee is actually required by the Employer to provide services during such notice period. In the event of death or disability of Employee while still employed by Employer, the "Date of Termination" shall be the date of the Employee's death or the date upon which the Employee becomes terminated and is unable to return to Employee's prior duties and responsibilities with Employer.

b.      **Death or Disability Pro Rata Bonus.**  If Employee's employment is terminated for reason of death or disability, Employee or his or her estate or its beneficiaries shall be entitled to receive a "Pro-rata Bonus" payable no later than 90 days following the conclusion of the Performance Period in which the termination occurs. For purposes of this Agreement, "Pro-rata Bonus" shall be calculated by multiplying the Minimum Earned Income, Minimum New Business Income, and Production Ranges, as set forth in the Addendum, by a fraction, the numerator of which is the number of days elapsed in the Performance Period through the Termination Date and the denominator of which is 183.

c.      **Applicability of this Provision.**  The provisions of this section shall apply irrespective of whether the Employee's employment was terminated lawfully or unlawfully and notwithstanding any notice of termination or pay in lieu of notice to which the Employee may be entitled or any payment made to the Employee by way of salary continuance or otherwise.

5.    **NON-SOLICITATION; NON-COMPETITION; CONFIDENTIAL INFORMATION  AND NON-DISCLOSURE**

a.      **Confidentiality/Non-Disclosure Obligation.**

i.      Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

3

ii.      Employee acknowledges, however, that Employer has, in this provision, given Employee notice that, pursuant to federal law, an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret: (i) made in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

b.      **Return of Company Property.**  Employee agrees that all Confidential Information, whether embodied in hard copy, electronic media, or other forms, or copies thereof, is the property of Employer exclusively.  Employee agrees that upon the termination or cessation of Employee's employment with Employer, whether voluntary or involuntary, that Employee will immediately return to Employer all Confidential Information, Company property, and client property, in any form, including, but not limited to, hard copy and electronic form, and in any media in which such information is recorded or stored, including electronically on any electronic storage device of any kind. Employee agrees that Employee shall acquire no property rights or claim to the Confidential Information or any other property of Employer or its clients. Employee agrees and acknowledges that any Confidential Information given to Employee by Employer or that Employee is permitted to use for Employee's employment Employer remains Employer's property and that Employee has no right to keep such things, use them for non-Company use, retain them upon Employee's termination or cessation of Employee's employment with Employer, or use them in competition against Employer at any time.

c.      **Proprietary Rights and Works For Hire.**  Employee agrees that all work and creation of work products associated with this Agreement or Employee's employment with Employer during Employee's employment are deemed works for hire for Employer.  In consideration of employment with Employer, Employee assigns and transfers to Employer all rights of any kind and nature (including without limitation any royalties, other income, and property rights) in discoveries, inventions, patentable material, copyrightable materials, designs, methods, and any other work products whatsoever. Employee further agrees that Employee shall cause to be furnished to Employer such instruments, instructions, and documentation as Employer may reasonably require to ensure that the aforesaid rights shall belong to Employer upon request or at the end of Employee's employment.  Employee shall return all proprietary information to Employer.  Employee also agrees and understands that Employee cannot use as a defense to any improper misappropriation or retention of trade secrets that Employee thought Employee was entitled to use or retain such trade secrets because Employee created it or assisted in creating it.

d.      **Restrictive Covenants.**  Employee agrees further that in order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

i.      **Non-Solicitation of Company Officers, Employees, or Contractors.**  Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or provide services to, or for, Employer.

4

ii.    **Non-Solicitation of Company Clients and Accounts.**  Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer. For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee had written, quoted or been asked to write or quote contracts and/or policies, facilitated placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer.

iii.    **Non-Competition.**  During Employee's employment with Employer, Employee shall not directly or indirectly engage in any action or provide support, assistance or services to any other person or entity, if such activity would constitute competition with Employer's business. This proscription shall not apply to solely passive investments to which Employee provides no advisory, consulting, employment or solicitation services.

e.    **Irreparable Harm.**  Employee acknowledges that Employer has a legitimate need to protect itself from improper or unfair competition and to protect its Confidential Information, as well as Employer's client and account relationships with both its prospective and existing clients and accounts, to protect its client goodwill, and that the restrictions contained in this Agreement are reasonable and necessary to protect Employer's operations, legitimate competitive interests, and Confidential Information. Employee also recognizes the highly competitive nature of Employer's business and that irreparable harm would be caused by Employee's violation of the restrictions contained herein.

f.    **Remedies/Damages.**  Employee agrees that Employer's remedies at law for any violation of this Agreement are inadequate and that Employer has the right to seek injunctive relief in addition to any other remedies available to it. Therefore, if Employee breaches this Agreement, Employee agrees that Employer has the right to, and may seek issuance of a court-ordered temporary restraining order, preliminary injunction and permanent injunction, as well as any and all other remedies and damages, including monetary damages. In the event that Employee breaches this Agreement after the termination or expiration of Employee's employment, whether voluntary or involuntary, the two (2) year time period set forth in this Section 5 shall be tolled during the period of Employee's non-compliance or violation in order to provide Employer with the full restricted period to which it is entitled under this Agreement.

g.    **Duty to Disclose Agreement and to Report New Employer.**  Employee acknowledges that Employer has a legitimate business purpose in the protection of its trade secrets, proprietary information, competitive position, methods of operation, processes, procedures and vendors. Employee also recognizes and agrees that Employer has the right to such information as is reasonably necessary to inform Employer whether the terms of this Agreement are being complied with. Accordingly, Employee agrees that for a period of two (2) years following Employee's termination of employment, Employee will promptly and forthrightly provide any new employer with a copy of this Agreement and notify the new employer of Employee's obligations contained in this Agreement.

5

6. **TERMINATION AND WAIVER OF JURY TRIAL**.

Employee agrees to bring any claims that Employee may have against Employer within 180 days of the day that Employee knew, or should have known, of the facts giving rise to the cause of action and waive any longer, but not shorter, statutory or other limitations periods. This includes, but is not limited to, the initial filing of a charge with the Equal Employment Opportunity Commission and/or state equivalent civil rights agency. However, Employee understands that Employee will thereafter have the right to pursue any federal claim in the manner prescribed in any right to sue letter that is issued by an agency. Employer further agrees to waive any right to a jury trial in action commenced by Employee or Employer that arises under this Agreement.

7. **GENERAL PROVISIONS**

a. **Maintenance of Records.** Employer will be responsible for maintaining all appropriate records. Any Bonus due will be calculated according to Employer's records.

b. **Taxation of Bonus.** Any payments made to the Employee pursuant to this Agreement will be subject to all applicable withholdings under applicable law, including on account of income taxes. Any and all taxes payable in respect of any payment under this Agreement (including any penalties, fines or interest arising therefrom) shall be the sole responsibility of the Employee. The Employer shall, to the extent permitted by law, have the right to deduct from any payment any federal, provincial, foreign and local laws relating to the withholding of tax or other levies on employment compensation in relation to payments contemplated in this Agreement.

c. **No Fiduciary Duty.** Nothing contained in the Agreement and no action taken pursuant to the Agreement shall create or be construed to create a trust of any kind or any fiduciary relationship between the Employer and the Employee or other persons.

d. **Reasonable Interpretation and Modification.** The provisions of this Agreement are intended to be interpreted and construed in a manner so as to make such provisions valid, binding and enforceable. In the event that any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, then such provision shall be deemed to be modified to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted in a manner so as to make such provision valid, binding and enforceable, then such provision shall be deemed to be excised from this Agreement and the validity, binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

e. **Employer Modification of Agreement.** The Employer reserves the right to modify or terminate the Agreement at any time in its sole discretion provided that such change or termination shall not impair the rights of the Employee accrued under the Agreement as at the effective date of the change.

f. **No Guaranty of Employment.** This Agreement shall not constitute a condition of employment nor a commitment on the part of the Employer to ensure the continued employment of the Employee. Nothing in the Agreement shall confer upon an Employee any right to continue in the employ of the Employer or affect in any way the right of the Employer to terminate his or her employment at any time.

g. **Forfeiture of Bonus.** Notwithstanding any other provision of the Agreement, in addition to other action as may be taken by the Employer, where an Employee's performance is deemed to be unsatisfactory, the Bonus otherwise payable under the Agreement for the Performance Period may be forfeited in its entirety such that no payment will be made under the Agreement or reduced in part.

6

h.    **Prior Agreements Inoperative.**  This Agreement represents the entire agreement between the parties, and it shall supersede any and all prior written and oral agreements covering its subject matter. By way of example, but not by way of limitation, all prior bonus agreements between Employee and Employer, including, but not limited to, any prior Incentive Plan Agreements, are null and void.

i.    **Choice of Law and Venue.**  This Agreement is made in Michigan and shall be governed in all respects under the laws of the State of Michigan without respect to any other state's choice of law rules, statutes or regulations.  Venue of any action regarding the terms and conditions of this Agreement or any action arising under this Agreement shall be brought in the State courts of Michigan in Oakland County, Michigan or in the Federal court for the Eastern District of Michigan, Southern Division.  Employee waives any objections Employee may have to lack or personal jurisdiction or venue in any Michigan court. Both parties hereby waive any defense to lack of jurisdiction, improper forum, forum *non conveniens,* or improper venue, and waive any right to attempt to seek a change of venue or change of forum in the event an action is properly filed in the State of Michigan.

j.    **Understanding of Agreement.**  Employee acknowledges that it has read and understood the terms and conditions of this Agreement and acknowledges and agrees that it has had the opportunity to seek and was not prevented nor discouraged by the Employer from seeking any  independent legal advice which it considered necessary prior to the execution and delivery of this Agreement and that, in the event that it did not avail itself of that opportunity prior to signing this Agreement, it did so voluntarily without any undue pressure, and agrees that its failure to obtain independent legal advice will not be used by it as a defense to the enforcement of its obligations under this Agreement.

k.    **Entire Agreement.**  This Agreement represents the entire understanding between Employee and Employer regarding its contents and supersedes any prior or contemporaneous agreements, and any such prior or contemporaneous agreements are hereby integrated herein.  Any alteration, modification, or waiver of any provision of this Agreement shall not be valid unless in writing and signed by all parties.

l.    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Employer and its respective successors and assigns, and upon Employee and any of Employee's heirs, personal representatives, and assigns, except that Employee's duties hereunder may not be delegated or assigned.

m.    **Survival.**  Sections 5, 6 and 7 of this Agreement shall survive the termination of this Agreement.

n.    **No Conflict and Non-Use.**  Employee acknowledges and agrees that Employee is not subject to any other agreement or restriction from a prior employer or any other entity that prohibits Employee's employment or association with Employer Company or with Employee's execution of this Agreement. Employee acknowledges and agrees that Employee shall not use, disclose, share, or in any way misappropriate the trade secrets of any prior employers for the benefit of Employer or for use at Employer. Employee understands that Employer prohibits the improper use of any other company's trade secrets for use of Employee's employment with Company, and that Employer has no obligation to defend Employee if an action for such misappropriation or improper use of trade secrets is brought against Employee by any former employer or any other party.  Any such improper use or misappropriation of trade secrets is not, and Employee recognizes and acknowledges that it is not, within the scope of Employee's employment, and if doing so, Employee will not be doing so as the agent of Employer, but such acts will be deemed to be outside the scope of Employee's employment with Employer.

o.    **Execution and Counterparts.**  This Agreement may be executed in counterparts and any copies, facsimiles, or electronic transmissions or scans shall be treated as originals.

7

**This Agreement is between:**

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and

_____
(hereinabove and hereinafter designated as the "Employee")

**EMPLOYER**

_____
Signature

_____
Name

_____
Title

Date: _____ ____, _____

**EMPLOYEE**

_____
Signature

_____
Name

_____
Title

Date: _____ _____



## ADDENDUM TO INDIVIDUAL PRODUCTION AWARD

During the period this Addendum is in effect, Employee shall be eligible to be paid a Performance Award, as defined below. The Performance Award and any other bonus that may be payable to Employee under this Addendum, if any, shall be calculated using the formula set forth in this Addendum and shall be collectively referred to herein as the "Bonus.".

1.  For each of the two semi-annual Performance Periods in 2019, Employee's Minimum Earned Income shall be calculated as [ 1 ] times the Employee's annual Salary [ $ 113,500 ] as of the commencement of the first Performance Period., or $[ 113,500 ], divided by 2 , amounting to [ 56,750 ] for each of the two semi-annual Performance Periods ("Performance Award").

2.  For each of the two semi-annual Performance Periods in 2019, Employee's New Business Income must exceed $[ 80,000 ] ("Minimum New Business Income") to qualify for a Performance Award under this Agreement.

3.  For each of the two semi-annual Performance Periods in 2019, Employee shall be entitled to a Performance Award calculated in accordance with the following commission schedule.

| Commission Rate | Production Range (Earned Income) |
|---|---|
| 10% | Minimum to $225,000 |
| 15.0% | >$225,000 to $300,000 |
| 17.5% | >$300,000 to $375,000 |
| 20.0% | >$375,000 to $500,000 |
| 25.0% | >$500,000 to $1,000,000 |
| 30.0% | >$1,000,000 to $1,250,000 |
| 35.0% | >$1,250,000 and greater |

4.  If Employee's Minimum Earned Income exceeds the upper end of the production range for a level, the levels that are exceeded shall not be applicable to the calculation of the Performance Award. In such instances, the Minimum Earned Income shall constitute the lower end of the production range for the next applicable level. Employee shall be eligible only for a Performance Award payable at the Commission Rate for the tier into which Employee's Earned Income falls.

5.  Employee shall only be entitled to receive a Bonus as set forth in this Addendum if Employee has executed an Individual Production Award Agreement.

6.  The term "Salary" as used in this Agreement and Addendum shall refer only to Employee's standard wages during any applicable Performance Period. "Salary" shall not include any Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

7.  In addition to the Performance Award set forth above in this Addendum, Employee may be eligible for an annual bonus calculated in accordance with the following schedule and based upon the New Business Minimum ("New Business Award"). To qualify for a New Business Award, Employee's New Business Income must meet or exceed the product that is two times Employee's Minimum New Business Income ("New Business Award Threshold"). If the New Business Income Targets set forth

below are met, the Employee shall be eligible to receive the amount set forth in the brackets in the table below. These amounts set forth in the table below are cumulative. Employee shall receive the bracketed New Business Bonus for each New Business Income Target Employee reaches in a given calendar year. This New Business Income will be paid in addition to the Performance Award outlined above in this Addendum. All New Business Bonuses attributable to all New Business Income Targets that Employee meets will be paid on or before March 15 of the year after the New Business Bonus was earned, subject to Section 2 of the Individual Production Award Agreement.

| Annual Minimum New Business | Target 1 New Business Income [Additional Bonus] | Target 2 New Business Income [Additional Bonus] | Target 3 New Business Income [Additional Bonus] |
|---|---|---|---|
| 100,000 (2 x $50,000) | 175,000 [2,500] | 250,000 [5,000] | 350,000 [7,500] |
| 130,000 (2 x $65,000) | 250,000 [5,000] | 350,000 [7,500] | 500,000 [12,500] |
| 160,000 (2 x $80.000) | 350,000 [7,500] | 500,000 [12,500] | 750,000 [15,000] |
| 190,000 (2 x 95,000) | 350,000 [7,500] | 500,000 [12,500] | 750,000 [15,000] |

**This Agreement is between:**

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and
    Brent Johnson

_____
(hereinabove and hereinafter designated as the "Employee")


**EMPLOYER**

*James Epting*
_____
Signature
    James Epting

_____
Name
    Senior Vice President

_____
Title
        01/04/2019
Date: _____     _____,
_____

**EMPLOYEE**

*Brent Johnson*
_____
Signature
    Brent Johnson

_____
Name
    Brent Johnson

_____
Title
        01/04/2019
Date: _____     _____,_____

2

 **InsureSign Document Completion Certificate**

```
Document Reference    : c4aff637-5b83-4955-a2c6-7432d53f751512964
Document Title        : Johnson revised 2019 addendum
Document Region       : Northern Virginia
Sender Name           : James Epting
Sender Email          : jeepting@burns-wilcox.com
Total Document Pages  : 3
Secondary Security    : Not Required
Participants

  1. Brent Johnson (bhjohnson@burns-wilcox.com)
  2. James Epting (jeepting@burns-wilcox.com)
```

## Document History

| Timestamp | Description |
|---|---|
| 12/18/2018 10:51AM EST | Document sent by James Epting (jeepting@burns-wilcox.com). |
| 12/18/2018 10:51AM EST | Email sent to Brent Johnson (bhjohnson@burns-wilcox.com). |
| 12/18/2018 10:51AM EST | Email sent to James Epting (jeepting@burns-wilcox.com). |
| 01/04/2019 10:44AM EST | Document viewed by Brent Johnson (bhjohnson@burns-wilcox.com). 63.85.131.9 Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko |
| 01/04/2019 10:45AM EST | Brent Johnson (bhjohnson@burns-wilcox.com) has agreed to terms of service and to do business electronically with James Epting (jeepting@burns-wilcox.com). 63.85.131.9 Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko |
| 01/04/2019 10:45AM EST | Signed by Brent Johnson (bhjohnson@burns-wilcox.com). 63.85.131.9 Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko |
| 01/04/2019 10:45AM EST | Email sent to James Epting (jeepting@burns-wilcox.com). |
| 01/04/2019 15:57PM EST | Document viewed by James Epting (jeepting@burns-wilcox.com). 107.77.236.170 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1_2 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 01/04/2019 15:57PM EST | James Epting (jeepting@burns-wilcox.com) has agreed to terms of service and to do business electronically with James Epting (jeepting@burns-wilcox.com). 107.77.236.170 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1_2 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 01/04/2019 15:57PM EST | Signed by James Epting (jeepting@burns-wilcox.com). 107.77.236.170 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1_2 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 01/04/2019 15:57PM EST | Document copy sent to James Epting (jeepting@burns-wilcox.com). |
| 01/04/2019 15:57PM EST | Document copy sent to Brent Johnson (bhjohnson@burns-wilcox.com). |

# EXHIBIT D



### INDIVIDUAL PRODUCTION AWARD

Burns & Wilcox, Ltd. [1], a Michigan corporation ("Employer") wishes to link a portion of Employee (defined herein) compensation to Employee production, creating an incentive for Employee to increase his or her production. Therefore, it is agreed that the Employer will pay the Employee, in addition to his or her annual salary, a Bonus (defined herein) which shall be calculated in accordance with the schedule set forth in the Addendum subject to the terms and conditions set out herein. Although this Individual Producer Award Agreement is continuously binding upon the Employee throughout his or her entire employment with the Employer and need not be annually re-executed, re-signed, or renegotiated to be enforceable and binding, the Addendum shall be re-signed by the Employer and the Employee once annually, and may be amended at that time. The Individual Producer Award and the ancillary Addendum that is in effect during any period shall be referred to as the "Agreement" for the purposes of that Period.

1. **DEVELOPMENT AND PAYMENT RECORD**

    a.    **Timing of Payment Calculation.** The Performance Award, as defined in the Addendum, shall be paid to eligible employees in the time, manner and calculation as set forth in the attached Addendum. Any other bonuses that may be payable to Employee are set forth in the Addendum. In the Agreement, the Performance Award and any other bonus otherwise set forth in the Addendum shall be referred to collectively as the "Bonus."

    b.    **Timing of Payment.** Final computation and payment of the Performance Award shall occur within 75 days following the close of the applicable Performance Period (defined herein) in which it is earned. Any other bonus that may be due to Employee shall be paid within the time period set forth in the Addendum to this Agreement.

2. **ELIGIBILITY CRITERIA**

In addition to the other eligibility criteria set out herein, to be eligible under this Agreement to receive any Bonus, the Employee must:

    a.    be actively employed by Employer at the time the Bonus is paid;

    b.    be properly licensed to transact insurance business as required by all applicable laws during the entirety of the Performance Period for which any Bonus is to be earned;

    c.    re-sign the Addendum to this Agreement, as amended by Employer, within 10 days of the commencement of the applicable Performance Period, as defined in the Addendum;

---

[1] The parties agree that all references to Employer, Company, or H.W. Kaufman Financial Group, Inc. in this Agreement shall include Burns & Wilcox, Ltd., AJK Enterprises, Inc., AJK Holdings, LLC, AJK Toronto, Ltd. and AJK London, LLC and all of their owners, stockholders, predecessors, successors, assigns, agents, directors, officers, employees, representatives, attorneys, corporate subsidiaries, parents, brother companies, affiliates, (and agents, directors, officers, employees, representatives and attorneys, of said subsidiaries and affiliates) and all persons acting by, through, under or in concert with any of them. Any reference to "Burns & Wilcox" in this Agreement, moreover, shall refer to Burns & Wilcox, Burns & Wilcox Brokerage and Burns & Wilcox, Ltd.

Revised November 2018

d.      produce or receive credit from Employer for the production of earned income greater than or equal to the "Minimum Earned Income" as defined in the Addendum;

e.      produce or receive credit from Employer for the production of earned income from new business greater than or equal to the minimum "New Business Income" as defined in the Addendum; and

f.      have executed an agreement similar to this Agreement.

3.   **DEFINITION AND METHOD OF CALCULATION**

a.      **Definition of Performance Period.**  "Performance Period" shall be defined as set forth in the Addendum.

b.      **Definition of Earned Income.** "Earned Income" shall be defined as "Total Earned Income", as used in Employer's generally accepted business practices, produced by Employee during the Performance Period, as reported by Employer's records. Adjustments to "Total Earned Income" shall include the following.

  i.      The cost of inspections and audits, as well as other pass-through expenses shall be deducted from Earned Income in the Performance Period in which the costs are incurred;

  ii.     Earned income credit from the Referral Program," as defined by Employer, shall be included in Employee's Earned Income;

  iii.    Earned income generated from non-carrier suppliers on the non-carrier supplier excluded list shall be deducted from Employee's Earned Income; and

  iv.     Any overage for any inspection or audit shall not be included in Earned Income or Total Earned Income.

c.      **Definition of New Business Income.** "New Business Income" shall be defined as the "Total Earned Income" or "Net Retained" from new business produced by Employee during the Performance Period, as reported by Employer's records, less any applicable returns related to the new business generated, subject to the following requirements.

  i.      New Business Income shall be new with respect to both the Employer and the Employee.

  ii.     New Business Income shall not include income from any merger or acquisition by Employer or any of Employer's parent, sister or subordinate entities.

  iii.    New Business includes new business income generated through the Referral Program.

d.      **Definition of Salary.**  The term "Salary" as used in this Agreement and the Addendum shall refer only to Employee's standard wages during any applicable Performance Period.  "Salary" shall not include and Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

e.   **Holdback for Possible Inability to Collect Premium or Fees.**  A percentage of each Bonus that is earned shall be held back to protect Employer from potential inaccuracies in the Bonus calculation resulting from returns, cancellations, uncollected premiums or other unusual circumstances. The amount of the holdback shall be 10% of the Bonus otherwise earned in any applicable Performance Period.   To the extent not exhausted by returns cancellations, uncollected premiums or other unusual circumstances, the retained amounts shall be added, in full, to Employee's Bonus payment for the next consecutive Performance Period, provided that Employee is employed by Employer at the time the next consecutive Bonus payment is due.

4.   **TERMINATION OF EMPLOYMENT**

a.   **Definition of Termination Date.**  "Termination Date" shall mean the date upon which the Employee ceases to be employed by the Employer and does not include any period following the date on which an Employee is notified that his or her employment or services are terminated during which the Employee is eligible to receive any statutory, contractual or common law notice or compensation in lieu thereof or severance payments unless the Employee is actually required by the Employer to provide services during such notice period. In the event of death and disability of Employee while still employed by Employer, the "Date of Termination" shall be the date of the Employee's death or the date upon which the Employee becomes terminated and is unable to return to Employee's prior duties and responsibilities with Employer.

b.   **Death or Disability Pro Rata Bonus.**  If Employee's employment is terminated for reason of death or disability, Employee or his or her estate or its beneficiaries shall be entitled to receive a "Pro-rata Bonus" payable no later than 90 days following the conclusion of the Performance Period in which the termination occurs.  For purposes of this Agreement, "Pro-rata Bonus" shall be calculated by multiplying the Minimum Earned Income, Minimum New Business Income, and Production Ranges, as set forth in the Addendum, by a fraction, the numerator of which is the number of days elapsed in the Performance Period through the Termination Date and the denominator of which is 183.

c.   **Applicability of this Provision.**  The provisions of this section shall apply irrespective of whether the Employee's employment was terminated lawfully or unlawfully and notwithstanding any notice of termination or pay in lieu of notice to which the Employee may be entitled or any payment made to the Employee by way of salary continuance or otherwise.

5.   **NON-SOLICITATION; NON-COMPETITION; CONFIDENTIAL INFORMATION  AND  NON-DISCLOSURE**

a.   **Confidentiality/Non-Disclosure Obligation.**

i.   Employee will not disclose to anyone in any way, directly or indirectly, Employer's Confidential Information or improperly make use of Employer's Confidential Information both during Employee's employment with Employer and at any time after Employee's employment with Employer terminates or expires, whether such termination or expiration is voluntary or involuntary. Specifically, but not by way of limitation, except as necessary for the performance of Employee's duties and responsibilities for Employer, at no time during or after Employee's employment with Employer, shall Employee directly or indirectly (nor instruct, request or encourage any other person or entity to directly or indirectly) use any trade secret or confidential or proprietary information (including, but not limited to, agent lists, client lists, contract terms, ratings, expirations, renewals, business plans, costs, pricing and/or financial information) belonging to Employer.

ii.     Employee acknowledges, however, that Employer has, in this provision, given Employee notice that, pursuant to federal law, an individual may not be held criminally or civilly liable under any federal or state trade secret law for disclosure of a trade secret: (i) made in confidence to a government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; and/or (ii) in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. Additionally, an individual suing an employer for retaliation based on the reporting of a suspected violation of law may disclose a trade secret to his or her attorney and use the trade secret information in the court proceeding, so long as any document containing the trade secret is filed under seal and the individual does not disclose the trade secret except pursuant to court order.

b.     **Return of Company Property.**  Employee agrees that all Confidential Information, whether embodied in hard copy, electronic media, or other forms, or copies thereof, is the property of Employer exclusively.  Employee agrees that upon the termination or cessation of Employee's employment with Employer, whether voluntary or involuntary, that Employee will immediately return to Employer all Confidential Information, Company property, and client property, in any form, including, but not limited to, hard copy and electronic form, and in any media in which such information is recorded or stored, including electronically on any electronic storage device of any kind. Employee agrees that Employee shall acquire no property rights or claim to the Confidential Information or any other property of Employer or its clients. Employee agrees and acknowledges that any Confidential Information given to Employee by Employer or that Employee is permitted to use for Employee's employment Employer remains Employer's property and that Employee has no right to keep such things, use them for non-Company use, retain them upon Employee's termination or cessation of Employee's employment with Employer, or use them in competition against Employer at any time.

c.     **Proprietary Rights and Works For Hire.**  Employee agrees that all work and creation of work products associated with this Agreement or Employee's employment with Employer during Employee's employment are deemed works for hire for Employer.  In consideration of employment with Employer, Employee assigns and transfers to Employer all rights of any kind and nature (including without limitation any royalties, other income, and property rights) in discoveries, inventions, patentable material, copyrightable materials, designs, methods, and any other work products whatsoever. Employee further agrees that Employee shall cause to be furnished to Employer such instruments, instructions, and documentation as Employer may reasonably require to ensure that the aforesaid rights shall belong to Employer upon request or at the end of Employee's employment.  Employee shall return all proprietary information to Employer.  Employee also agrees and understands that Employee cannot use as a defense to any improper misappropriation or retention of trade secrets that Employee thought Employee was entitled to use or retain such trade secrets because Employee created it or assisted in creating it.

d.     **Restrictive Covenants.**  Employee agrees further that in order to preserve the confidentiality of the Confidential Information, to prevent the theft or misuse of the Confidential Information, to protect Employer's client and account relationships, with both its prospective and existing clients, to protect its client goodwill, and to protect Employer from improper or unfair competition, Employee will not, directly or indirectly, during Employee's employment and for a period of two (2) years from the date Employee's employment with Employer ends, terminates or expires, for any reason whatsoever, whether such termination or expiration is voluntary or involuntary, perform any of the following activities.

i.     **Non-Solicitation of Company Officers, Employees, or Contractors.**  Employee will not, directly or indirectly, solicit, divert, or attempt to solicit or divert, from Employer any officer, employee, contractor or any person providing services to, or on behalf of, Employer, or influence any such person to no longer serve as an officer, employee or contractor, or provide services to, or for, Employer.

4

ii.     **Non-Solicitation of Company Clients and Accounts.**  Employee will not: (i) call upon, contact, solicit, divert, service, or accept any business from any Burns & Wilcox client or account for the purposes of directly or indirectly providing any services or products similar to those offered by Employer, including, but not limited to, distribution, underwriting, financing, claims, loss control and/or audits; (ii) directly or indirectly solicit, divert, service or accept on behalf of any new employer or new entity any insurance policy for a particular insured party for which insured party the Employee had provided such services or attempted to provide services in the two years prior to the end of Employee's employment with Employer.  For the purposes of this Agreement, "client" or "account" shall include any insurance solicitor, insurance agent, insurance broker, insurance producer, insurance wholesaler, managing general agent, risk manager, third party administrator or otherwise with whom Employee had written, quoted or been asked to write or quote contracts and/or policies, facilitated placement or otherwise provided brokerage services to on behalf of Employer during the two (2) years preceding the date of Employee's termination and/or resignation from Employer. For the purposes of this Agreement, "account" shall include any insurance policy Employer had written, quoted or been asked to write or quote during the two (2) years preceding the date of Employee's termination and/or resignation from Employer.

iii.     **Non-Competition.**   During Employee's employment with Employer, Employee shall not directly or indirectly engage in any action or provide support, assistance or services to any other person or entity, if such activity would constitute competition with Employer's business. This proscription shall not apply to solely passive investments to which Employee provides no advisory, consulting, employment or solicitation services.

e.     **Irreparable Harm.**  Employee acknowledges that Employer has a legitimate need to protect itself from improper or unfair competition and to protect its Confidential Information, as well as Employer's client and account relationships with both its prospective and existing clients and accounts, to protect its client goodwill, and that the restrictions contained in this Agreement are reasonable and necessary to protect Employer's operations, legitimate competitive interests, and Confidential Information.  Employee also recognizes the highly competitive nature of Employer's business and that irreparable harm would be caused by Employee's violation of the restrictions contained herein.

f.     **Remedies/Damages.**  Employee agrees that Employer's remedies at law for any violation of this Agreement are inadequate and that Employer has the right to seek injunctive relief in addition to any other remedies available to it.  Therefore, if Employee breaches this Agreement, Employee agrees that Employer has the right to, and may seek issuance of a court-ordered temporary restraining order, preliminary injunction and permanent injunction, as well as any and all other remedies and damages, including monetary damages. In the event that Employee breaches this Agreement after the termination or expiration of Employee's employment, whether voluntary or involuntary, the two (2) year time period set forth in this Section 5 shall be tolled during the period of Employee's non-compliance or violation in order to provide Employer with the full restricted period to which it is entitled under this Agreement.

g.     **Duty to Disclose Agreement and to Report New Employer.**  Employee acknowledges that Employer has a legitimate business purpose in the protection of its trade secrets, proprietary information, competitive position, methods of operation, processes, procedures and vendors.  Employee also recognizes and agrees that Employer has the right to such information as is reasonably necessary to inform Employer whether the terms of this Agreement are being complied with.  Accordingly, Employee agrees that for a period of two (2) years following Employee's termination of employment, Employee will promptly and forthrightly provide any new employer with a copy of this Agreement and notify the new employer of Employee's obligations contained in this Agreement.

5

6.   **TERMINATION AND WAIVER OF JURY TRIAL**.

Employee agrees to bring any claims that Employee may have against Employer within 180 days of the day that Employee knew, or should have known, of the facts giving rise to the cause of action and waive any longer, but not shorter, statutory or other limitations periods. This includes, but is not limited to, the initial filing of a charge with the Equal Employment Opportunity Commission and/or state equivalent civil rights agency. However, Employee understands that Employee will thereafter have the right to pursue any federal claim in the manner prescribed in any right to sue letter that is issued by an agency. Employer further agrees to waive any right to a jury trial in action commenced by Employee or Employer that arises under this Agreement.

7.   **GENERAL PROVISIONS**

a.     **Maintenance of Records.** Employer will be responsible for maintaining all appropriate records. Any Bonus due will be calculated according to Employer's records.

b.     **Taxation of Bonus.** Any payments made to the Employee pursuant to this Agreement will be subject to all applicable withholdings under applicable law, including on account of income taxes. Any and all taxes payable in respect of any payment under this Agreement (including any penalties, fines or interest arising therefrom) shall be the sole responsibility of the Employee. The Employer shall, to the extent permitted by law, have the right to deduct from any payment any federal, provincial, foreign and local laws relating to the withholding of tax or other levies on employment compensation in relation to payments contemplated in this Agreement.

c.     **No Fiduciary Duty.** Nothing contained in the Agreement and no action taken pursuant to the Agreement shall create or be construed to create a trust of any kind or any fiduciary relationship between the Employer and the Employee or other persons.

d.     **Reasonable Interpretation and Modification.** The provisions of this Agreement are intended to be interpreted and construed in a manner so as to make such provisions valid, binding and enforceable. In the event that any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, then such provision shall be deemed to be modified to the extent necessary to make such provision valid, binding and enforceable, or, if such provision cannot be modified or restricted in a manner so as to make such provision valid, binding and enforceable, then such provision shall be deemed to be excised from this Agreement and the validity, binding effect and enforceability of the remaining provisions of this Agreement shall not be affected or impaired in any manner.

e.     **Employer Modification of Agreement.** The Employer reserves the right to modify or terminate the Agreement at any time in its sole discretion provided that such change or termination shall not impair the rights of the Employee accrued under the Agreement as at the effective date of the change.

f.     **No Guaranty of Employment.** This Agreement shall not constitute a condition of employment nor a commitment on the part of the Employer to ensure the continued employment of the Employee. Nothing in the Agreement shall confer upon an Employee any right to continue in the employ of the Employer or affect in any way the right of the Employer to terminate his or her employment at any time.

g.     **Forfeiture of Bonus.** Notwithstanding any other provision of the Agreement, in addition to other action as may be taken by the Employer, where an Employee's performance is deemed to be unsatisfactory, the Bonus otherwise payable under the Agreement for the Performance Period may be forfeited in its entirety such that no payment will be made under the Agreement or reduced in part.

h.    **Prior Agreements Inoperative.**  This Agreement represents the entire agreement between the parties, and it shall supersede any and all prior written and oral agreements covering its subject matter. By way of example, but not by way of limitation, all prior bonus agreements between Employee and Employer, including, but not limited to, any prior Incentive Plan Agreements, are null and void.

i.    **Choice of Law and Venue.**  This Agreement is made in Michigan and shall be governed in all respects under the laws of the State of Michigan without respect to any other state's choice of law rules, statutes or regulations.  Venue of any action regarding the terms and conditions of this Agreement or any action arising under this Agreement shall be brought in the State courts of Michigan in Oakland County, Michigan or in the Federal court for the Eastern District of Michigan, Southern Division.  Employee waives any objections Employee may have to lack or personal jurisdiction or venue in any Michigan court. Both parties hereby waive any defense to lack of jurisdiction, improper forum, forum *non conveniens*, or improper venue, and waive any right to attempt to seek a change of venue or change of forum in the event an action is properly filed in the State of Michigan.

j.    **Understanding of Agreement.**  Employee acknowledges that it has read and understood the terms and conditions of this Agreement and acknowledges and agrees that it has had the opportunity to seek and was not prevented nor discouraged by the Employer from seeking any  independent legal advice which it considered necessary prior to the execution and delivery of this Agreement and that, in the event that it did not avail itself of that opportunity prior to signing this Agreement, it did so voluntarily without any undue pressure, and agrees that its failure to obtain independent legal advice will not be used by it as a defense to the enforcement of its obligations under this Agreement.

k.    **Entire Agreement.**  This Agreement represents the entire understanding between Employee and Employer regarding its contents and supersedes any prior or contemporaneous agreements, and any such prior or contemporaneous agreements are hereby integrated herein.  Any alteration, modification, or waiver of any provision of this Agreement shall not be valid unless in writing and signed by all parties.

l.    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of Employer and its respective successors and assigns, and upon Employee and any of Employee's heirs, personal representatives, and assigns, except that Employee's duties hereunder may not be delegated or assigned.

m.    **Survival.**  Sections 5, 6 and 7 of this Agreement shall survive the termination of this Agreement.

n.    **No Conflict and Non-Use.**  Employee acknowledges and agrees that Employee is not subject to any other agreement or restriction from a prior employer or any other entity that prohibits Employee's employment or association with Employer Company or with Employee's execution of this Agreement. Employee acknowledges and agrees that Employee shall not use, disclose, share, or in any way misappropriate the trade secrets of any prior employers for the benefit of Employer or for use at Employer. Employee understands that Employer prohibits the improper use of any other company's trade secrets for use of Employee's employment with Company, and that Employer has no obligation to defend Employee if an action for such misappropriation or improper use of trade secrets is brought against Employee by any former employer or any other party.  Any such improper use or misappropriation of trade secrets is not, and Employee recognizes and acknowledges that it is not, within the scope of Employee's employment, and if doing so, Employee will not be doing so as the agent of Employer, but such acts will be deemed to be outside the scope of Employee's employment with Employer.

o.    **Execution and Counterparts.**  This Agreement may be executed in counterparts and any copies, facsimiles, or electronic transmissions or scans shall be treated as originals.

7

**This Agreement is between:**

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and

_____

(hereinabove and hereinafter designated as the "Employee")

**EMPLOYER**

_____

Signature

_____

Name

_____

Title

Date: _____ _____, _____

**EMPLOYEE**

_____

Signature

_____

Name

_____

Title

Date: _____ _____, _____



## ADDENDUM TO INDIVIDUAL PRODUCTION AWARD

During the period this Addendum is in effect, Employee shall be eligible to be paid a Performance Award, as defined below. The Performance Award and any other bonus that may be payable to Employee under this Addendum, if any, shall be calculated using the formula set forth in this Addendum and shall be collectively referred to herein as the "Bonus.".

1. For each of the two semi-annual Performance Periods in 2019, Employee's Minimum Earned Income shall be calculated as [ 2 ] times the Employee's annual Salary [ $77,000 ] as of the commencement of the first Performance Period., or $[ 154,000 ], divided by 2 , amounting to [ 77,000 ] for each of the two semi-annual Performance Periods ("Performance Award").

2. For each of the two semi-annual Performance Periods in 2019, Employee's New Business Income must exceed $[ 80,000 ] ("Minimum New Business Income") to qualify for a Performance Award under this Agreement.

3. For each of the two semi-annual Performance Periods in 2019, Employee shall be entitled to a Performance Award calculated in accordance with the following commission schedule.

| Commission Rate | Production Range (Earned Income) |
|---|---|
| 10% | Minimum to $225,000 |
| 15.0% | >$225,000 to $300,000 |
| 17.5% | >$300,000 to $375,000 |
| 20.0% | >$375,000 to $500,000 |
| 25.0% | >$500,000 to $1,000,000 |
| 30.0% | >$1,000,000 to $1,250,000 |
| 35.0% | >$1,250,000 and greater |

4. If Employee's Minimum Earned Income exceeds the upper end of the production range for a level, the levels that are exceeded shall not be applicable to the calculation of the Performance Award. In such instances, the Minimum Earned Income shall constitute the lower end of the production range for the next applicable level. Employee shall be eligible only for a Performance Award payable at the Commission Rate for the tier into which Employee's Earned Income falls.

5. Employee shall only be entitled to receive a Bonus as set forth in this Addendum if Employee has executed an Individual Production Award Agreement.

6. The term "Salary" as used in this Agreement and Addendum shall refer only to Employee's standard wages during any applicable Performance Period. "Salary" shall not include any Bonus payable under this Agreement and shall not include any other compensation not guaranteed to Employee in any given year.

7. In addition to the Performance Award set forth above in this Addendum, Employee may be eligible for an annual bonus calculated in accordance with the following schedule and based upon the New Business Minimum ("New Business Award"). To qualify for a New Business Award, Employee's New Business Income must meet or exceed the product that is two times Employee's Minimum New Business Income ("New Business Award Threshold"). If the New Business Income Targets set forth

below are met, the Employee shall be eligible to receive the amount set forth in the brackets in the table below.  These amounts set forth in the table below are cumulative.  Employee shall receive the bracketed New Business Bonus for each New Business Income Target Employee reaches in a given calendar year.  This New Business Income will be paid in addition to the Performance Award outlined above in this Addendum. All New Business Bonuses attributable to all New Business Income Targets that Employee meets will be paid on or before March 15 of the year after the New Business Bonus was earned, subject to Section 2 of the Individual Production Award Agreement.

| Annual Minimum New Business | Target 1 New Business Income [Additional Bonus] | Target 2 New Business Income [Additional Bonus] | Target 3 New Business Income [Additional Bonus] |
|---|---|---|---|
| 100,000 (2 x $50,000) | 175,000 [2,500] | 250,000 [5,000] | 350,000 [7,500] |
| 130,000 (2 x $65,000) | 250,000 [5,000] | 350,000 [7,500] | 500,000 [12,500] |
| 160,000 (2 x $80.000) | 350,000 [7,500] | 500,000 [12,500] | 750,000 [15,000] |
| 190,000 (2 x 95,000) | 350,000 [7,500] | 500,000 [12,500] | 750,000 [15,000] |

**This Agreement is between:**

Burns & Wilcox Ltd.
(hereinabove and hereinafter designated as the "Employer")

and

Carrie Sheen
_____
(hereinabove and hereinafter designated as the "Employee")

**EMPLOYER**

*James Epting*
_____
Signature

James Epting
_____
Name

Senior Vice President
_____
Title

            12/16/2018
Date: _____ _____,
_____

**EMPLOYEE**

C Shn
_____
Signature

Carrie Sheen
_____
Name

Carrie Sheen
_____
Title

            12/16/2018
Date: _____ _____, _____

2

 **InsureSign** ⌂InsureSign Document Completion Certificate

```
Document Reference    : 320b4e18-4738-4788-9f18-91f7f4dd2be012964
Document Title        : sheen corrected
Document Region       : Northern Virginia
Sender Name           : James Epting
Sender Email          : jeeping@burns-wilcox.com
Total Document Pages  : 3
Secondary Security    : Not Required
Participants

  1. Carrie Sheen (casheen@burns-wilcox.com)
  2. James Epting (jeeping@burns-wilcox.com)
```

## Document History

| Timestamp | Description |
|---|---|
| 12/16/2018 16:09PM EST | Document sent by James Epting (jeeping@burns-wilcox.com). |
| 12/16/2018 16:09PM EST | Email sent to Carrie Sheen (casheen@burns-wilcox.com). |
| 12/16/2018 16:09PM EST | Email sent to James Epting (jeeping@burns-wilcox.com). |
| 12/16/2018 16:33PM EST | Document viewed by Carrie Sheen (casheen@burns-wilcox.com). 67.166.250.249 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 16:34PM EST | Carrie Sheen (casheen@burns-wilcox.com) has agreed to terms of service and to do business electronically with James Epting (jeeping@burns-wilcox.com). 67.166.250.249 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 16:34PM EST | Signed by Carrie Sheen (casheen@burns-wilcox.com). 67.166.250.249 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 16:34PM EST | Email sent to James Epting (jeeping@burns-wilcox.com). |
| 12/16/2018 17:23PM EST | Document viewed by James Epting (jeeping@burns-wilcox.com). 107.77.236.199 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 17:34PM EST | Document viewed by James Epting (jeeping@burns-wilcox.com). 107.77.236.199 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 17:34PM EST | James Epting (jeeping@burns-wilcox.com) has agreed to terms of service and to do business electronically with James Epting (jeeping@burns-wilcox.com). 107.77.236.199 Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 17:34PM EST | Signed by James Epting (jeeping@burns-wilcox.com). 107.77.236.199 |

## Document History

| Timestamp | Description |
|---|---|
| | Mozilla/5.0 (iPhone; CPU iPhone OS 12_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.0 Mobile/15E148 Safari/604.1 |
| 12/16/2018 17:34PM EST | Document copy sent to James Epting (jeepting@burns-wilcox.com). |
| 12/16/2018 17:34PM EST | Document copy sent to Carrie Sheen (casheen@burns-wilcox.com). |